**In re the MARRIAGE OF Morion Patricia MEDLOCK and Doyle Edward Medlock.**

**Morion Patricia MEDLOCK, Respondent,**

v.

**Doyle Edward MEDLOCK, Appellant.**

No. 15276.

Missouri Court of Appeals, Southern District, Division One.

April 20, 1988.

David T. Welch, Philip J. Morgan, Phillips, McElyea, Walker & Carpenter, P.C., Camdenton, for appellant.

William F. Washburn, Eldon, for respondent.

CROW, Chief Judge.

Doyle Edward Medlock ("Doyle") appeals from a decree dissolving his 20–year marriage to Morion Patricia Medlock ("Patricia"). He avers the trial court (1) erred in its "valuation and division of the pension plans owned by the parties," (2) wrongly ordered him to pay Patricia $375 per month for support of the parties' son, (3) improperly commanded him to pay $1,750 to Patricia for attorney fees, and (4) abused its discretion in awarding Patricia "a disproportionate amount of the marital assets."

Doyle, age 62 at time of trial, and Patricia, age 60 at time of trial,[1] began cohabiting in 1954 and married May 10, 1967. At time of trial they had one unemancipated child, Gregory Lee Medlock, born May 30, 1973.

The marital real estate consisted of two lots, to which we shall refer, respectively, as Lot 27 and Lot 29, their designations at trial. A real estate appraiser testified that Lot 27 "has 95.1 feet of frontage on the lake," and that Lot 29 "has 233 feet of frontage." A house sits on Lot 27. However, said the appraiser, "I have been told that the garage does extend over onto Lot 29."

As we comprehend the evidence, Lot 29 is encumbered by a deed of trust securing payment of a "note," the unpaid principal balance of which, according to Patricia, is "[p]robably about $47,000." It appears from the fragmentary evidence regarding the note that the maker was an emancipated child of the parties, and that neither Patricia nor Doyle signed it.

As to the value of the real estate, the appraiser testified that if 108 front feet of

---

1. Trial occurred February 11, 1987.

Lot 29 were taken from that parcel and added to Lot 27 (the house site), the remaining part of Lot 29 (having 125 feet of lake frontage) would have a fair market value of $32,500. Lot 27 (enhanced by the 108 feet taken from Lot 29) would have the house and 203.1 feet of lake frontage, and, according to the appraiser, a fair market value of $129,000. The appraiser valued the land at $260 "per front foot."

The trial court, in its findings of fact, valued the real estate, in the aggregate, at $161,500. The trial court adopted the appraiser's value of $260 per foot of lake frontage for the land, and the trial court valued the "improvements and home" at $76,220.[2]

The decree ordered that Lots 27 and 29 be sold at a price mutually agreeable to Patricia and Doyle within 90 days of the date of judgment, with the "net proceeds" divided 65 per cent to Patricia and 35 per cent to Doyle. The decree further provided:

"Unless otherwise agreed, it is ordered the parties shall accept any offer on the house of $125,000.00 or greater and any offer on the vacant lot of $30,000.00 or greater. If the property is not sold within 90 days, said property shall be sold at a public auction for the highest price obtainable."

The above-quoted provision is peculiar in that the decree says nothing about taking any land from Lot 29 and adding it to Lot 27. Lot 29, as we have seen, has 233 feet of lake frontage. At the rate of $260 per front foot fixed by the appraiser and accepted by the trial court, Lot 29, if sold intact, would—but for the $47,000 encumbrance—have a fair market value of $60,-580, more than twice the $30,000 figure in the above provision.

However, because of the $47,000 encumbrance it is impossible to predict what a buyer might be willing to pay for Lot 29. The encumbrance on Lot 29 would, so far as we can determine, remain unimpaired by a sale, and we profess no ability to predict

whether the maker of the note will ultimately pay it. Obviously, a buyer of Lot 29 would face the possibility of having to pay the note in order to protect his investment.

If the trial court did contemplate taking part of Lot 29 and adding it to Lot 27 (as the $30,000 figure arguably suggests), the encumbrance problem would remain, and if the parcels were bought by different buyers, both purchasers would be faced with uncertainty.

On the other hand, if Lots 27 and 29 were sold as they presently exist, and if they were bought by different purchasers, a problem would exist if the garage on Lot 27 did indeed encroach on Lot 29. That would obviously depress the purchase price of Lot 27.

Doyle, however, assigns no error regarding the court-ordered sale. Instead, he protests that the overall division of the marital assets gives Patricia more than she should have gotten. Therefore, we shall not further address the manner in which the trial court chose to dispose of the real estate, except insofar as it affects the value of marital assets apportioned respectively to Patricia and Doyle.

■ Doyle's first assignment of error pertains to the "pension plans" and has four components. The first component we address is component "B," which maintains that the trial court erred in treating 100 per cent of Doyle's pension as marital property. According to Doyle, the trial court should have treated 23 per cent of the pension as Doyle's separate property, as his entitlement to that percentage was acquired prior to the marriage.

Doyle testified without contradiction that he worked for Union Electric 26 years before retiring in January, 1985. He receives a pension from Union Electric amounting to $617.87 per month. In his testimony, Doyle placed a value of $60,000 on his "pension plan." How he arrived at that figure is unexplained.

---

**2.** The trial court evidently arrived at this figure by multiplying $260 by the total number of feet of lake frontage contained in both lots (328), and subtracting the result ($85,280) from $161,-500.

The trial court, in its findings of fact, found that Doyle's "retirement plan with Union Electric" had an approximate value of $60,000.

Doyle insists that inasmuch as he worked for Union Electric 26 years and the parties were married only 20 years, 6/26 (23 per cent) of his pension should have been considered his separate property.

The first problem with Doyle's contention is that nowhere in the trial court's findings of fact or conclusions of law does the trial court state that it treated 100 per cent of Doyle's pension rights as marital property, and nowhere does the trial court set forth the aggregate value of the marital property awarded respectively to Patricia and to Doyle.

More importantly, however, there was no evidence from which the trial court could have determined the date when Doyle began acquiring pension rights with Union Electric. While Doyle's employment there antedated the marriage, Doyle presented no evidence showing when his pension rights began to accrue.

Doyle, as appellant, bears the burden of demonstrating error. *State ex inf. Ashcroft, ex rel. Plaza Properties, Inc. v. City of Kansas City*, 687 S.W.2d 875, 876[2] (Mo. banc 1985); *Union Electric Co. v. McNulty*, 344 S.W.2d 37, 39[2] (Mo.1961). He has failed to do so as to component "B" of his first point.

■ Component "C" of Doyle's first point attacks the trial court's finding regarding Patricia's "pension" of $250 per month. Patricia testified without contradiction that she worked 33 years before becoming "disabled" in 1976. At that time, said Patricia, she started "collecting disability." At time of trial, according to Patricia, she was receiving "disability from the Teamster's Union" of $250 per month. Elsewhere in her testimony, Patricia characterized the $250 per month as "retirement." Patricia valued her "pension plan with Teamsters" at $20,000, but supplied no clue as to how she arrived at that figure. Doyle, during his testimony, acknowledged that he "adopted" Patricia's figure of $20,000 as the value of her "benefit."

The trial court, in its findings of fact, found that Patricia receives $250 per month "from a Teamsters' Pension/Disability Plan and it would have a present value of approximately $20,000.00."

Doyle maintains that the trial court should have taken into account the fact that Patricia, a 60–year-old woman, has a life expectancy 5 years greater than Doyle, a 62–year-old man. In support of this thesis, Doyle directs our attention to certain "mortality tables" judicially noticed by the trial court at Doyle's request.

Patricia responds that Doyle should be "estopped" from arguing that her "pension" is worth anything other than $20,000, as he "agreed to this figure."

Doyle, as explained above, admitted during his testimony that he adopted Patricia's figure of $20,000 as the value of her benefit (presumably her monthly entitlement to $250). Additionally, Doyle submitted proposed findings of fact and conclusions of law to the trial court. Paragraph 25 of the findings of fact stated, in pertinent part:

"[Patricia's] pension plan has a present value of approximately $20,000...."

■ We hold that if the trial court erred in fixing $20,000 as the "present value" of Patricia's "Pension/Disability Plan" (an issue we need not attempt to decide), such error was invited by Doyle in (1) adopting that amount during his testimony, and (2) asking the trial court to make a finding to that effect. A party will not be heard to complain on appeal of an alleged error in which, by his own conduct at the trial, he joined or acquiesced. *Taylor v. Cleveland, C., C. & St. L. Ry. Co.*, 333 Mo. 650, 63 S.W.2d 69, 74–75[15] (1933); *Benjamin v. Benjamin*, 370 S.W.2d 639, 643[11] (Mo.App.1963). On appeal, a party is bound by the position he took in the circuit court and will not be heard on a different theory. *In re Marriage of Kinnick*, 621 S.W.2d 104, 105–06[4] (Mo.App.1981); *In re Marriage of Hunter*, 614 S.W.2d 277, 278[2] (Mo.App.1981).

Additionally, the $250 Patricia receives each month may not even be marital property. In *Sherman v. Sherman*, 740 S.W.

2d 203 (Mo.App.1987), it was held that disability benefits received by a husband pursuant to a policy held by him in an insurance company's long term disability plan were a substitute for his lost earnings occasioned by his inability to work, and were consequently the same as post-dissolution earnings which are nonmarital property. Patricia insists in her brief that the $250 payments she receives each month are "payments for disability rather than pension."

■ We have set forth earlier some of the terms by which the parties referred to those payments. The terms "pension" and "retirement" indicate, of course, that the payments are benefits under a retirement plan. Under Missouri law, such benefits are marital property if the retirement plan is acquired during the marriage. *Kuchta v. Kuchta,* 636 S.W.2d 663, 666[3] (Mo. banc 1982). The term "disability," however, connotes money representing lost earnings occasioned by an inability to work, declared nonmarital property in *Sherman.* Doyle, in his brief, characterizes Patricia's $250 per month as "disability income."

■ Neither party furnished the trial court sufficient information about Patricia's $250 monthly payments to conclusively establish that they are marital property. Doyle, therefore, is unable to demonstrate error in component "C" of his first point.

■ Component "D" of Doyle's first point asserts the trial court failed to consider "the federal and state income tax consequences" when valuing the parties' pensions. Again, the record is insufficient to support the claim of error. The only evidence regarding the "income tax consequences" of the "pensions" was Doyle's testimony that "I have to pay income tax on that." He added:

"[W]hen I retired, they were supposed to take out dependent—three dependents. So they've got me down for three dependents, and I don't have it now. And then they didn't take out enough for all of it. So I had to pay quite a bit of income tax on it. So it's not net. I

mean—yes. It's not net. And it's really not gross. It's an in between."

Doyle did not offer the trial court any document showing the amount of income tax he had paid in any year preceding the trial, and he fails to direct our attention to any evidence regarding the "income tax consequences" other than the baffling testimony reported above. Furthermore, there is no showing that the trial court, in dividing the marital property, ignored Doyle's testimony that his pension constituted taxable income. Finally, while Doyle maintains that his pension was valued "based on before tax consequences," nothing in the record establishes that assumption. It was Doyle who valued his "pension plan" at $60,000, and, as noted earlier, he failed to explain how he arrived at that figure. Whether he considered the "income tax consequences" is consigned to speculation. Component "D" of Doyle's first point is without merit.

Component "A" of Doyle's first point states:

"The trial court divided the property of the marriage by including the values of both pensions and the trial court then improperly considered the income being received from the pensions when awarding maintenance to [Patricia]."

To evaluate this contention, one needs to know more about the parties' assets and incomes.

Patricia testified that in addition to her $250 per month from the Teamsters, she receives $569 per month "Social Security." The evidence showed that Doyle, in addition to his Union Electric pension, receives "a pension from the Veterans" and benefits "from Social Security." The trial court found that Doyle's Veterans benefit amounted to $308 per month, and that his Social Security benefit amounted to $612 per month. Those findings are unchallenged.

The trial court also found that the parties owned 638 shares of Union Electric, worth $29 per share at time of trial. That finding is likewise unchallenged. The trial court apportioned 319 shares to Patricia and the other 319 shares to Doyle.

In deciding the issue of maintenance, the trial court found that Patricia was unable to support herself through appropriate employment, that because of her age and disability she was unable to find sufficient employment, and that there was no marital misconduct on her part. Furthermore, said the court:

> "The Court further considered [Patricia's] total income of $819.00 per month plus approximately $600.00 per year she will be receiving in stock dividends compared to [Doyle's] income of $1,537.87 per month plus his $600.00 he is to receive in stock dividends from Union Electric; and thus, the Court awards [Patricia] the sum of $200.00 per month as and for maintenance."

The $819 figure (above) is the sum of Patricia's $250 per month Teamsters benefit and her $569 per month Social Security benefit; the $1,537.87 figure (above) is the sum of Doyle's $617.87 per month Union Electric pension, his $308 per month "Veterans" benefit, and his $612 per month from Social Security.

The marital real estate and its disposition have already been discussed. There were, however, motor vehicles and other tangible personal property. Utilizing the values assigned by the trial court (about which Doyle registers no complaint), the decree awarded Patricia personal items valued at $500, household goods and appliances valued at $2,000, a 1979 truck valued at $2,500, a 1948 Jeep valued at $600, a 1970 boat valued at $1,800, and a 1970 trailer valued at $200. The decree awarded Doyle personal items valued at $500, a 1976 boat valued at $1,500, a 1981 outboard motor valued at $2,500, a 1977 trailer valued at $600, a trolling motor valued at $150, guns valued at $250, and a 1978 automobile valued at $2,000.

In regard to debts, the trial court found that the parties owed Amoco $285.32, and that Patricia owed "MasterCard" approximately $700. The trial court ordered Patricia to pay those obligations. The trial court found that Patricia had borrowed $2,500 to pay property taxes for 1985 and 1986; the trial court ordered Doyle to reimburse Patricia half that amount.

The trial court found that the parties owed Western Auto $500 and owed a bank $1,291.05 on a note. The trial court ordered Doyle to pay those sums, and also ordered Doyle to reimburse Patricia $2,065.68 (half the amount she had previously paid on the note). Finally, the trial court found that Doyle had taken quilts worth $1,750 from the parties' home. The trial court ordered Doyle to return them to Patricia or pay her $1,750.

Disregarding, for the moment, the disposition of the real estate, and employing the values set forth above, we see that Patricia was awarded:

| | |
|---|---:|
| Teamsters Pension/Disability Plan | $20,000.00 |
| 319 shares, Union Electric | 9,251.00 |
| tangible personal property | 7,600.00 |
| reimbursement for taxes | 1,250.00 |
| reimbursement for note payment | 2,065.68 |
| quilts or cash equivalent | 1,750.00 |
| Total | $41,916.68 |

Reducing the above figure by the $985.32 debts assigned Patricia by the decree, Patricia ends up with $40,931.36.

Doyle was awarded:

| | |
|---|---:|
| Union Electric pension | $60,000 |
| 319 shares, Union Electric | 9,251 |
| tangible personal property | 7,500 |
| Total | $76,751 |

Reducing the above figure by the $1,791.05 debts assigned Doyle by the decree, Doyle ends up with $74,959.95. If we further reduce Doyle's amount by (a) the $2,065.68 Doyle was ordered to pay Patricia in reimbursement for note payments, and (b) the $1,750 Doyle was ordered to pay Patricia to replace the quilts, Doyle is left with $71,144.27.

We remarked earlier about the difficulty occasioned by the deed of trust in determining the value of the real estate. If the encumbrance is ignored—though we fail to see how it could be—the value of the real estate, according to the trial court, is $161,500. If one takes 65 per cent of that amount and adds it to Patricia's $40,931.36, she comes away with $145,906.36. If one

takes 35 per cent of $161,500 and adds it to Doyle's $71,144.27, he comes away with $127,669.27.

The situation changes dramatically, however, if the value of the real estate is reduced by the unpaid balance of $47,000 on the note secured by the deed of trust. That makes the real estate worth $114,500. Taking 65 per cent of that amount and adding it to Patricia's $40,931.36 gives her $115,356.36. Taking 35 per cent of $114,500 and adding it to Doyle's $71,144.27 gives him $111,219.27.

Returning now to component "A" of Doyle's first point, we find the gist of it in the following excerpt from his brief:

"The correct action by the [trial court] would have been to either divide the value of [Doyle's] pension as part of the property settlement and not consider the income from the pension when awarding maintenance or to do the reverse, not consider [Doyle's] pension plan when dividing the property and then to consider the income being received from the pension when considering maintenance. However, by doing both, the [trial court] awarded [Patricia] a greater share of Doyle's pension than she was entitled to."

■ Section 452.335(2), RSMo 1986, sets forth certain factors to be considered in determining the amount of a maintenance award. They include the financial resources of the party seeking maintenance, such party's ability to meet his (or her) needs independently, the standard of living established during the marriage, the duration of the marriage, the age and physical and emotional condition of the spouse seeking maintenance, and the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Doyle's monthly income was unquestionably relevant to the latter factor. We know of no case holding that a party's pension income cannot be considered in determining whether he can meet his own needs and also pay maintenance.

In *Gaal v. Gaal*, 727 S.W.2d 454 (Mo. App.1987), the husband, a retiree, was drawing a monthly pension. The trial court awarded the wife monthly maintenance; the husband challenged the award on appeal. Affirming, the appellate court considered the husband's pension as evidence of his capacity to pay the ordered maintenance.

Doyle maintains that component "A" of his first point is supported by *Balven v. Balven*, 734 S.W.2d 909, (Mo.App.1987). There, a husband was receiving retirement income of $1,353 per month, $400 of which was attributable to a program designed to encourage early retirement. Duration of that program was 48 months, after which the husband's retirement income would be reduced by $400 per month. The trial court awarded the wife weekly maintenance; the court determined that the $400 per month "bonus" should be treated as an "asset" rather than "income," and awarded it to the husband. The trial court awarded the wife certain property including the family home, the principal asset. On appeal, the husband complained about the maintenance award and the division of property. The opinion contains the following passage, relied upon by Doyle in the instant case:

"There was no dispute that husband was entitled to $400 a month for forty-eight months. Even if not marital property the court was entitled to consider the aggregate value as either marital property or future income when awarding it to husband. When measuring discretion or abuse of discretion it is the award and not the form of the award which may be considered. However, once the court determined that the $400 was to be treated as an asset the court was committed not to consider it as a basis for determining the award of maintenance, if any. Neither husband nor wife were entitled to a double benefit." *Id.* at 912–13.

The appellate court in *Balven* upheld the maintenance award but reversed the award of the family home to the wife and remanded with directions to award the husband "an equitable and just interest" in the home.

*Balven* is unlike the instant case in that the above-quoted passage from *Balven* pertains to a retirement bonus payable over 48 months, not to the husband's permanent retirement pay. Nothing in *Balven* implies the trial court improperly considered the husband's retirement pay in determining his ability to pay maintenance.

In *Bedwell v. Bedwell,* 626 S.W.2d 455 (Mo.App.1981), the husband had been in the armed forces some 18 years and 8 months before he married the wife. He retired 16 months after the marriage and began drawing a military pension. The marriage was dissolved 10 years after the husband's retirement; the trial court ordered the husband to pay maintenance. Appealing, the husband argued it was unfair to consider his military pension in gauging his ability to pay maintenance, as all but 16 months of the military service for which the pension was paid had been rendered prior to the marriage. Rejecting that contention, the appellate court held that the husband's military pension was income to him and, when added to his other income, made up the total amount available to him to meet his needs. *Id.* at 456.

We hold that the trial court in the instant case did not err in considering Doyle's Union Electric pension in evaluating his financial capacity to pay maintenance. Whether the trial court improperly handled Doyle's pension in dividing the marital property is discussed *infra* in our consideration of Doyle's fourth point. Doyle's first point is denied.

▇ Doyle's fourth point asserts the trial court abused its discretion in dividing the marital property by awarding Patricia a disproportionate amount of the marital assets. In his argument under this point, Doyle renews his complaint that the trial court improperly considered his income from his Union Electric pension in ordering him to pay maintenance to Patricia, when the trial court at the same time considered the $60,000 value of the pension in dividing the marital property.

In pondering Doyle's argument, we note that the $200 per month maintenance awarded Patricia is less than one-third of

Doyle's monthly Union Electric pension, and only about 13 per cent of Doyle's total monthly income of $1,537.87.

Even if one treated Patricia's maintenance as an award to her of one-third of Doyle's Union Electric pension—we do not imply it would be correct to do so in view of Doyle's other monthly income of $920—that would not result in a major change in the percentages of marital property awarded to Patricia and to Doyle. We set forth earlier the values of the items awarded in the decree, first considering the real estate without the $47,000 encumbrance and thereafter considering the real estate with the $47,000 encumbrance. In the latter situation, it will be recalled, Patricia ended up with $115,356.36, and Doyle ended up with $111,219.27. Using Doyle's figure of $60,000 as the value of his Union Electric pension, and treating Patricia's maintenance as an award of one-third of that amount, Doyle's interest in his pension is reduced to $40,000 and the value of Patricia's assets is enhanced by $20,000. That would make Patricia's share of the marital assets $135,356.36, and Doyle's share of the marital assets $91,219.27. That works out to slightly less than 60 per cent for Patricia and slightly more than 40 per cent for Doyle. Disregarding the $47,000 encumbrance on the real estate and following the same procedure, Patricia ends up with $165,906.36, or slightly over 60 per cent of the marital assets, while Doyle ends up with $107,669.27, or slightly less than 40 per cent.

In dividing marital property, one of the factors to be considered by a trial court is the conduct of the parties during the marriage. § 452.330(1)(4), RSMo 1986. The trial court in the instant case found that in 1971, Doyle had "a relationship with another female that caused a burden on the marital relationship." At the time Patricia ceased working in 1976, she and Doyle were living in St. Louis. The following year Patricia moved to Osage Beach to oversee construction of the home where she and Doyle planned to live after his retirement. Doyle continued to reside in St. Louis where he was employed. The

trial court found that Doyle moved into a female's home in St. Louis and did not disclose the address or telephone number to Patricia until after she had learned of them by other means. The trial court further found that after his retirement, Doyle admitted to Patricia that he had had "an intimate relationship with his landlord in St. Louis." The trial court further found that Doyle drank moderately to heavily throughout the marriage, and that under the influence of alcohol Doyle, at times, threatened and did bodily harm to Patricia. There was competent and substantial evidence to support all of the above findings.

Doyle acknowledges that in a dissolution proceeding, the division of marital property is left to the sound discretion of the trial court, and its decision should be upheld unless an abuse of discretion is shown. *Colabianchi v. Colabianchi,* 646 S.W.2d 61, 64[3] (Mo. banc 1983). In *Dardick v. Dardick,* 670 S.W.2d 865 (Mo. banc 1984), a division of marital property was affirmed where the evidence showed the value of the wife's share was from 64 to 75 per cent of the marital estate and the value of the husband's share was from 25 to 36 per cent of the marital estate. The opinion stated that § 452.330 requires a fair and equitable division of the marital property in light of the circumstances attending each individual case; it does not require an equal division of the property. *Id.* at 869[4].

In *Gray v. Gray,* 654 S.W.2d 309 (Mo. App.1983), a division of marital property awarding the wife 74 per cent and the husband 26 per cent was upheld where there was evidence of marital misconduct by the husband. In *P.L.K. v. R.J.K.,* 682 S.W.2d 486 (Mo.App.1984), a division of marital property awarding the wife 67 per cent and the husband 33 per cent was affirmed where there was evidence of marital misconduct by the husband. Given the discretion conferred on the trial court in dividing marital property, we cannot convict the trial court of error in its apportionment of the assets in the instant case. Doyle's fourth point is denied.

Doyle's second point attacks the order requiring him to pay Patricia child support for the parties' teenage son, custody of whom was awarded to Patricia. The decree provided:

"It is ... ordered ... that [Doyle] pay to [Patricia] as support ... for said minor child the sum of $375.00 per month, ... and, in default thereof, that execution issue therefor. Said sum shall be satisfied by payment received from Social Security."

As was the case regarding other aspects of this suit, the trial court was given little information by the parties about the Social Security. Patricia presented the trial court a form listing assets and income. It showed: "Social Security (Greg) $375.00" per month. The trial court, in its findings of fact, found that "the parties further receive the sum of $375.00 from Social Security for the benefit of the minor child...."

Doyle bases his second point on the following provision in the trial court's conclusions of law:

"... the Court finds that [Doyle] has an obligation to support Gregory Lee Medlock but that the Social Security payments at this time are sufficient to maintain Gregory ... and that therefore at this time no support is ordered."

Doyle maintains that the child support order is in conflict with the above-quoted conclusion. The order, according to Doyle, subjects him to the assumption that the Social Security payments will continue in the future and will remain at $375 per month. Should the payments cease or decrease, says Doyle, he would then be liable for $375 per month child support, "which would clearly be excessive in light of his fixed income and the circumstances of this case."

█ Assuming, without deciding, that the trial court's conclusion of law is inconsistent with the child support order in the decree, such inconsistency supplies no basis for disturbing the order. The decretal provisions of an order are controlling, and cannot be changed by the trial court's findings or memoranda. *Page v. Page,* 516 S.W.2d 537, 539[1] (Mo.App.1974). If there is any inconsistency between the recitals

and the decree, the latter controls. *Starrett v. Starrett*, 703 S.W.2d 544, 547–48[5] (Mo.App.1985).

Doyle does not question whether a trial court is authorized to order child support, then provide that the judgment debtor shall receive credit for the amount paid by Social Security. We therefore do not consider that issue, but instead confine our attention to Doyle's contention that the amount of the award is excessive.

■ Patricia's evidence amply demonstrated a need for $375 per month child support. Setting the amount of child support is a matter within the sound discretion of the trial court. *Geil v. Geil*, 647 S.W.2d 161, 162[3] (Mo.App.1983); *Miller v. Miller*, 599 S.W.2d 237, 239[1] (Mo.App.1980). On the record before us, we hold the child support order does not constitute an abuse of discretion, particularly inasmuch as it presently has no adverse effect on Doyle's financial situation. If circumstances should change in the future, Doyle can seek modification. § 452.370, RSMo 1986. Doyle's second point is denied.

■ The only point not yet considered is Doyle's point three, which assigns error in the provision of the decree ordering Doyle to pay Patricia $1,750 toward her attorneys' fees. Doyle points out that taking into account the $200 per month maintenance awarded Patricia, he is left with a monthly income of approximately $1,337 and Patricia enjoys a monthly income of approximately $1,019. Doyle insists he "was in no better position to finance the litigation than was [Patricia]."

Section 452.355, RSMo 1986, governs the awarding of attorney fees in dissolution actions. An excellent analysis of the statute appears in *Kieffer v. Kieffer*, 590 S.W.2d 915, 917–19 (Mo. banc 1979), where the Supreme Court concludes that a trial court, after considering all relevant factors including the financial resources of both parties, has considerable discretion in awarding attorney fees, and only when a trial court is shown to have abused the broad discretion with which it is vested will its award be overturned.

In *Hemphill v. Hemphill*, 710 S.W.2d 438 (Mo.App.1986), an award of $2,500 in attorney fees to a wife was upheld where the husband's gross income exceeded the wife's by $500 per month and there was evidence of marital misconduct by the husband. Measured by *Kieffer* and *Hemphill*, we cannot say that the attorney fee award in the instant case constituted an abuse of discretion.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.