**Mary Sue HALL, Respondent,**

v.

**Bob Dean HALL, Appellant.**

**No. WD 43213.**

Missouri Court of Appeals, Western District.

Feb. 19, 1991.

Dennis J.C. Owens, Kansas City, for appellant.

George R. Lilleston, Clinton, for respondent.

Before SHANGLER, P.J., and KENNEDY and FENNER, JJ.

FENNER, Judge.

Bob Dean Hall appeals from the portion of a dissolution of marriage decree awarding marital property to his former wife, Mary Sue Hall.

The Halls were married in 1976, they separated approximately eleven years later and they were ultimately divorced in 1990. Both had been previously married and had children from their separate marriages. At the time of the dissolution hearing, Bob Dean Hall was age 55, Mary Sue Hall was age 48, and their children were grown.

Before their marriage, the Halls agreed that they would maintain their separate residences until Mary Sue Hall's daughter graduated from high school, at which time Mary Sue Hall would move to Bob Dean Hall's residence. Mary Sue Hall held a life estate interest in a house in Clinton. Bob Dean Hall owned a house in Raytown, which was sparsely equipped with furniture only in one bedroom.

During the marriage, Bob Dean Hall commuted to Mary Sue Hall's Clinton home on most weekends. On those weekends, Mary Sue Hall would maintain a clean house, prepare her husband's meals, do his laundry and iron his clothes. Bob Dean Hall provided his wife with money in amounts varying from $15 to $40 on a weekly basis for household expenses. He also contributed $8,100 toward repairs to Mary Sue Hall's Clinton home. The Halls spent their vacations together and travelled extensively using Bob Dean Hall's TWA airfare pass.

The Halls were employed throughout their marriage. Bob Dean Hall began working for TWA in Kansas City in 1966. At the time of the dissolution hearing, he was working as a jet aircraft mechanic, was earning gross annual pay of nearly $40,000, and was accruing substantial deferred compensation and retirement benefits. Mary Sue Hall worked for Clearfield Cheese in Clinton from 1963 to May of

1987, when her employment terminated due to the closing of the main plant. She was forced to use her retirement savings account and pension benefits to cover living expenses and costs for remodeling work on her home. She went to work for Golden Valley Foods in June of 1987, but was laid off in April of 1988. She secured other employment at Schreiber Foods, but took a substantial cut in pay and benefits. Her gross monthly pay approximated $1200 at the time of the dissolution hearing. Completely different from her previous jobs, her work at Schreiber required her to stand on her feet during ten-hour shifts and aggravated an existing medical condition which caused swelling to the legs and ankles. Because of her concern about another plant closing and her inability to stand on her feet, Mary Sue Hall was considering taking a medical transcriber course in order to qualify for other employment.

Mary Sue Hall attributed the breakdown of the marriage to her losing her job and to her becoming a financial burden to her husband. Bob Dean Hall refused her requests to move to his Raytown residence and to provide her with additional financial support.

In its dissolution decree, the trial court awarded Mary Sue Hall $500 per month as periodic maintenance for one year and $2,500 in attorney's fees. Property allocations to Mary Sue Hall included household goods in her possession, two cars, the IRA account in her name at the TWA Credit Union, in addition to the following case allotments and monetary interests:

| Wife's Share | Description of Asset |
| --- | --- |
| $ 7,000 | one-half value of loose coin collection |
| $ 2,496 | one-half of net funds in TWA Credit Union Savings Account |
| $ 2,209 | one-half of present drawable value of IAM Deferred Compensation Plan |
| $39,155 lien | one-half present value of Machinists' Trust Annuity Plan (Plan B), available upon Bob Dean Hall's retirement or termination of employment from TWA |
| $ 181.82 monthly retirement pay | 59% of one-half of present fully vested monthly benefit of $616.67 of TWA Machinists' Retirement Plan (Plan A), payable upon Bob Dean Hall's retirement or termination of employment from TWA |

To Bob Dean Hall, the court awarded the entire loose coin collection; the remaining portions of the TWA Credit Union Savings Account, the TWA IAM Deferred Compensation Plan, the Machinists' Trust Annuity Plan (Plan B), and the TWA Machinists' Retirement Plan (Plan A); the household goods in his possession; two cars acquired during the marriage; his coin collection valued at $100; the IRA account in his name at the TWA Credit Union; and the plate, dish, figurine, and music box collections in his possession.

In his first point, Bob Dean Hall appears to argue that the award of certain property to Mary Sue Hall was based on insufficient evidence identifying that property as marital or non-marital. He specifically objects to the award to his former wife of shares in the coin collection, the TWA Credit Union Savings Account, Pension Plans A and B, and the IAM Deferred Compensation Plan. He claims the proportionate shares awarded to his former wife to be unfounded because no evidence established the value of the various assets or the date of their acquisition.

Bob Dean Hall contends that the trial court erroneously valued the loose coin collection at $14,000 by basing its determination solely on Mary Sue Hall's "guesstimate." The record, however, reveals substantial evidence of valuation. Mary Sue Hall testified at the hearing that

the loose coin collection consisted of mainly quarters and some dimes and nickels. The loose coin collection was stored for a time during the marriage in Mary Sue Hall's Clinton home in Pringles potato chip cans which covered the floor of a closet and in pint sherbet containers which were stacked on top of one another under a double bed. In her testimony, Mary Sue Hall indicated that each Pringles can held $170 worth of quarters and each sherbet container held $115 worth of quarters; she calculated the value of the entire collection to be $14,000. In his testimony, Bob Dean Hall acknowledged the existence of the loose coin collection, but denied that it was worth $14,000. As indicated by the decree, the trial court relied on Mary Sue Hall's testimony in valuing the loose coin collection. The trial court is entitled to believe or disbelieve the testimony of either party concerning the valuation of property in a dissolution proceeding. *In re Marriage of Smith*, 785 S.W.2d 764, 767 (Mo.App.1990).

In support of the claimed errors in allocating his retirement benefits and credit union account, Bob Dean Hall argues that the trial court based its valuation of each asset on speculation and conjecture, and failed to consider the proportionate value of each account which had accrued before the marriage.

The record shows that throughout the dissolution proceedings, Bob Dean Hall failed to comply with discovery and subpoenas. In answers to interrogatories, he failed to disclose the existence of his credit union savings account and indicated that he had no pension plans. At the dissolution hearing, counsel for Mary Sue Hall submitted exhibits and called witnesses to establish the existence and the present values of each of Bob Dean Hall's accounts. The TWA Credit Union Savings Account contained a net balance of $4,991.76. Funds deducted from Bob Dean Hall's biweekly pay checks were directed to the credit union account for deposit and for repayment of a home improvement loan. The present value of Bob Dean Hall's accrued monthly benefit in Plan A totalled $616.67. His drawable contributions in the IAM Deferred Compensation Plan as of September

30, 1989, amounted to $3,418; his biweekly pay stubs reflected additional contributions to the plan of $250 to $300. Plan B was valued at $78,310.50. TWA employees, called by Mary Sue Hall's counsel, testified that Bob Dean Hall began his participation in Plan A in November of 1966 and that he joined the IAM Deferred Compensation Plan in April of 1989. However, the employees had no information as to when Bob Dean Hall opened the TWA Credit Union Account or when he began his participation in Plan B, which was offered to TWA employees in February of 1970. Bob Dean Hall testified that he did not know when he began participating in Plan B.

■ Pension benefits may be properly considered as marital property. *Kuchta v. Kuchta*, 636 S.W.2d 663, 666 (Mo. banc 1982). The trial court possesses broad discretion in identifying marital property. *Rapp v. Rapp*, 789 S.W.2d 148, 150 (Mo. App.1990). Under § 452.330.3, RSMo Supp.1990, all property acquired by either spouse subsequent to the marriage is presumed to be martial property regardless of how title is held. *Id.* A spouse who claims such property to be non-marital must assume the burden of rebutting the presumption by clear and convincing evidence. *Id.*

■ Contrary to Bob Dean Hall's argument, a sufficient basis existed for valuing and identifying the contested assets. Mary Sue Hall presented evidence on the present value of each asset; Bob Dean Hall offered no opposing evidence. In awarding Mary Sue Hall 59% of one-half of the present value of the Plan A monthly benefits, the trial court took into consideration Bob Dean Hall's participation in the plan before the marriage, calculating the percentage of the monetary award on the length of the marriage and the length of Bob Dean Hall's participation in the plan. The court also considered that Bob Dean Hall began contributions to the IAM Deferred Compensation Plan after the marriage in its award of one-half of the present value to Mary Sue Hall. Although Mary Sue Hall's evidence failed to establish the effective dates of Bob Dean Hall's participation in

the TWA Credit Union Savings Account and Plan B, the trial court committed no error in awarding one-half of the value of those accounts to Mary Sue Hall. Mary Sue Hall claimed those accounts to be marital property, established their existence during the marriage, and proved their present value. She further demonstrated that contributions of marital property were made to those accounts during the marriage. Bob Dean Hall did nothing to meet his burden of proof. He failed to offer any evidence showing what proportion of the accounts, if any, constituted his separate property. *See In re Marriage of Medlock,* 749 S.W.2d 437, 440 (Mo.App.1988) (in which husband, whose employment antedated the marriage and who presented no evidence showing when his pension rights began to accrue, failed to demonstrate error in treatment of 100% of pension rights as marital property); *see also Moss v. Moss,* 723 S.W.2d 898, 899 (Mo.App.1987). We, accordingly, deny Bob Dean Hall's first point on appeal.

In Point II, Bob Dean Hall contends that the trial court demonstrated its bias and prejudice toward him by rendering overall favorable awards to Mary Sue Hall. He maintains that the trial court manifested its dislike for him by failing to properly consider the odd nature of the marriage, by refusing to allow him to present his "sugar daddy theory", by awarding periodic maintenance to Mary Sue Hall, by focusing on his failure to comply with discovery and subpoenas, and by failing to give reasons for its decision.

The record dispels each of Bob Dean Hall's contentions. At a hearing on post-trial motions, the trial judge commented that Bob Dean Hall demonstrated a lack of respect for the authority of the court or authority of any kind; however, the judge noted that Bob Dean Hall's conduct had nothing to do with the decision in the case.

Although Bob Dean Hall emphasizes the fact that he and his wife never established a common marital residence, substantial evidence showed that the Halls agreed before their marriage to their living arrangements; and that, during their marriage, they provided each other with companionship, Mary Sue Hall supplied domestic services, and Bob Dean Hall contributed financial support.

▮ Bob Dean Hall presents no argument showing that evidence in support of his "sugar daddy theory" was admissible. Claims of error not developed in the argument portion of the brief present nothing for appellate review. *Kreitz v. Kreitz,* 750 S.W.2d 681, 686 (Mo.App.1988).

▮ With regard to the award of periodic maintenance, Bob Dean Hall insinuates that the trial court revealed its prejudice against him by relying on unsubstantiated evidence of Mary Sue Hall's medical condition. The transcript shows that Mary Sue Hall wore medical support hose and took diuretics to alleviate swelling in her ankles and legs. Other evidence supported the award of rehabilitative maintenance: the Halls' disproportionate earning capacities and Mary Sue Hall's lack of job security in her present employment.

Bob Dean Hall's failure to comply with discovery and subpoenas resulted from his own inaction and provides no basis for any claim of trial court error. *Medlock,* 749 S.W.2d at 440.

▮ Bob Dean Hall's final contention that the trial court demonstrated its bias by failing to give reasons for its decision is unfounded. Neither party requested the court to issue findings pursuant to Rule 73.01(a)(2). *Binkley v. Binkley,* 725 S.W.2d 910, 912 (Mo.App.1987).

Point II is denied.

In light of the standard of appellate review enunciated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), we affirm.

All concur.