**Jerry D. MISTLER, Petitioner–Respondent,**

v.

**Ruth Ann MISTLER, Respondent–Appellant.**

No. 17050.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 29, 1991.

Motion for Rehearing or Transfer Denied Sept. 20, 1991.

Brad J. Fisher, W. Craig Hosmer, Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for respondent-appellant.

Robert M. Sweere, Ivella McWhorter Elsey, Springfield, for petitioner-respondent.

SHRUM, Judge.

In this domestic relations case, the wife Ruth Ann Mistler appeals from those portions of a dissolution decree that divided property, ordered the husband Jerry D. Mistler to pay $500 a month child support, and declined to order the husband to pay the wife's attorney fees.

The principal property division issue is the characterization, as marital or nonmarital, of post-dissolution monthly annuity payments due each party. The payments are part of a court-approved settlement of the parties' claims that arose following an injury the husband sustained during the marriage. By its judgment, the trial court determined each party's post-dissolution annuity payments to be nonmarital property. We find no error in that determination. Finding no merit in the wife's remaining assignments of error, we affirm the judgment.

## FACTS

The husband and wife were married January 9, 1971, and their marriage was dissolved June 28, 1990, following a separation that began in June 1986. One child,

Jared Scott Mistler, was born of the marriage on March 28, 1972.

There was conflicting evidence about the work history, work habits, and earning ability of the husband during the marriage, but the record is clear that during their marriage the parties were of modest financial means until January 12, 1982, when they settled their respective claims that arose from the husband's personal injuries.

The husband had sustained serious head injuries on August 4, 1978, while working at the Union Electric power plant near Fulton, Missouri. He was struck on the head with a three-ton steel beam, and the resultant injuries left him with both physical and mental impairments to the extent that he was totally disabled. The husband filed a claim for workers' compensation benefits, and both parties sued Union Electric in the City of St. Louis for the husband's personal injury and the wife's loss of consortium claims. On January 12, 1982, the Union Electric suit was settled.

Because the husband was incompetent at the time, the proposed settlement was presented to the Circuit Court in St. Louis for approval. A transcript of the settlement conference reveals that the wife had been appointed guardian for the husband and that she was at the conference in her individual capacity and as guardian. The husband was not present. The settlement court did not appoint a guardian ad litem, although the conference transcript reveals that the court earlier had considered appointing one if it had perceived "an inappropriate allocation of the funds of the proposed settlement" between the husband and the wife.

Under the terms of the proposed settlement, the defendant would pay the following:

1. To the husband: $48,000 per year with annual increases at 6 percent, to be paid for 10 years or for his life, whichever was greater;

2. To the wife: $150,000 initial payment plus $2,250 per month with annual increases at 6 percent, payable for 40 years;

3. To their son Jared Scott Mistler: $13,000 in 1990; $14,000 in 1991; $15,000 in 1992; $16,000 in 1993; and $50,000 in 1995.

4. Plaintiffs' trial preparation costs: up to $250,000.

5. Plaintiffs' attorney fee: $1,325,000, payable as follows: $650,000 at time of settlement; $225,000 in three years; $225,000 in four years; $225,000 in five years.

There were additional settlement terms. The workers' compensation carrier would pay medical expenses to the date of the settlement and waive all subrogation rights to any of the settlement proceeds, the husband's compensation claim would be dismissed with prejudice, and the husband would waive his claim to any medical expenses that were incurred after the date of the settlement. Future payments were to be made through the purchase of annuities. The present value of the settlement was calculated to be $2,381,118.

The settlement court rejected the initial proposal stating it would not approve "that kind of attorney fee in a minor or incompetent's case." The court approved a settlement that lowered the attorney fees and added an immediate lump-sum payment of $306,251.67 to the husband. Considering that lump-sum payment, the settlement court stated:

The court will propose to order that sum paid to Ruth Ann Mistler as guardian of the estate of Jerry Dennis Mistler for his use and benefit. Without such a payment, the court will have some difficulty approving the totality of the payment that was proposed to be made up front, as it were, to Ruth Ann Mistler in the amount of $150,000 without some portion of that being allocated to the estate. However, with this payment being made to the estate, the court can understand and appreciate that there is a need to pay money directly to Mrs. Mistler without its passing through the estate because the court has been informed that over the course of time since this accident, Mrs. Mistler has devoted herself to the care of her husband and that she has totally been responsible for maintaining

the family and the expenses at great personal cost to her, and I have been informed she probably even had to borrow money in order to meet the expenses of the family. That money should be repaid back by her, if that is the case, and she should have funds readily available to do it.

The husband's $306,251.67 lump sum was paid to the wife in her capacity as his guardian. By the time of the dissolution trial, the husband's annuity payments had increased to $6,375 per month and the wife's annuity payments had grown to $3,586 per month. A transcript of the settlement conference was admitted into evidence at the dissolution trial. By its decree, the dissolution court made the following division of property it classified as marital:

### MARITAL PROPERTY TO HUSBAND

| Property | Value |
|---|---|
| Shelby County farm (Jerry's farm) | $100,500 |
| Furniture/personal effects | 3,000 |
| 1983 gooseneck trailer | 2,000 |
| 1989 Chevrolet pickup | 12,500 |
| 1978 AAYR trailer | 5,000 |
| 1985 Ranger boat, Motorguide motor, Evinrude motor, and Woom boat trailer | 6,500 |
| 1984 Alumacraft, BMMF boat trailer, Suzuki and Mercury motors | 3,500 |
| Boatmen's trust account | 175,940 |
| Bank accounts in Jerry's name | 3,000 |
| **TOTAL** | **$311,940** |

### MARITAL PROPERTY TO WIFE

| Property | Value |
|---|---|
| Shelby County farm (Ruth Ann's farm) | $156,550 |
| Callaway County residence | 158,000 |
| Furniture/personal effects | 63,180 |
| 1986 Chevrolet Blazer | 8,500 |
| 1982 Oldsmobile | 1,000 |
| 1976 Dona grain trailer | 1,000 |
| 1982 Chevrolet truck | 4,000 |
| Ultralight one-man plane | 1,000 |
| Lawn and Leisure lawnmower | 100 |
| 1985 Minnk motor | 50 |
| E.D. Jones account | 42,000 |
| Kabota lawn tractor | 5,000 |
| LESS: debt on farm | (105,000) |
| furniture debt | ( 20,000) |
| **TOTAL** | **$315,380** |

The court declined to award maintenance or attorney fees to either party. The husband was ordered to pay $500 per month child support beginning June 1, 1990, and one-third of the child's "reasonable tuition" expenses. In its "Amended Decree" the trial court made these "findings":

21. That [the husband's] annuity represents future lost wages and earning capacity and is, consequently, nonmarital property.

22. That [the wife's] annuity represents her interest in [the husband's] future lost wages and earning capacity and is, therefore, nonmarital property.

. . . .

25. That the lump sum payments, and annuity payments made up to the Decree of Dissolution of Marriage are marital property, but any payments received thereafter constitute payments for future lost wages and earning capacity and is, therefore, nonmarital property.

The wife appeals from the portion of the judgment dividing the property, setting child support, and denying her an award of attorney fees. Additional facts will be set out as needed throughout the course of this opinion.

■ Appellate review of a court-tried case is governed by the principles enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). *See Misdary v. Misdary*, 737 S.W.2d 476, 479 (Mo.App.1987). Thus we must affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32.

## ANALYSIS AND DECISION

### POINT I: DIVISION OF PROPERTY

In her initial point on appeal, the wife challenges the trial court's division of property on several grounds. She contends the trial court erroneously found "that annuities awarded to [the husband] and [the wife] as part of a personal injury settlement made during the marriage for injuries suffered during the marriage represented future lost earnings and were non-marital property, when in fact the annuities were marital property...." She also asserts, under point one, the trial court committed error when it "failed to take [the husband's] Social Security income into account when distributing the property," that the court's "division of the annuities between the parties was inequitable," and that the court, in its division of property, erroneously failed to compensate for certain payments made by the wife and certain expenditures of the husband.

Section 452.330 of the Dissolution of Marriage Act, which deals with disposition of property, is set out in pertinent part in the margin.[1]

*Annuity Payments: Marital or Nonmarital?*

The wife states, "The law establishing that a personal injury settlement acquired during the marriage is marital property has been clear and unequivocal for years." For this proposition she cites *Nixon v. Nixon*, 525 S.W.2d 835, 839 (Mo.App.1975). The wife states that the principle enunciated in *Nixon* "has been consistently recog-

nized since," citing *McClement v. McClement*, 681 S.W.2d 500, 502 (Mo.App.1984); *Trapani v. Trapani*, 684 S.W.2d 500, 503 (Mo.App.1984); *Gonzalez v. Gonzalez*, 689 S.W.2d 383, 384–86 (Mo.App.1985); *Jobe v. Jobe*, 708 S.W.2d 322, 325 (Mo.App.1986); and *Zimmer v. Zimmer*, 770 S.W.2d 514, 515 (Mo.App.1989). For the reasons that follow, we do not consider the wife's above cited cases as dispositive authority.

The methods courts use to characterize a personal injury award as marital or non-marital have been discussed in numerous appellate court opinions throughout the country. Although there is no uniformity among the various states concerning the treatment of such awards, it is possible to identify two basic approaches: mechanistic and analytic. *Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430, 435 (1986); G. Blumberg, "Intangible Assets: Recognition and Valuation" in *2 Valuation and Distribution of Marital Property* § 23.08[1][a] (J. McCahey ed. 1991).

The mechanistic approach has been described as a "literal" one that "looks to the general statutory definitions of marital and separate property and concludes that [if] the award was acquired during the marriage and does not fall into the definition of separate property or into any enumerated exception to the definition of marital property, it must be marital property." *Johnson*, 346 S.E.2d at 435; Blumberg, § 23.-08[1][a]. The Blumberg article identifies the following jurisdictions as adherents to the mechanistic approach to categorizing

1. § 452.330 provides in part:
 1. In a proceeding for dissolution ... the court shall set apart to each spouse his non-marital property and shall divide the marital property....
 2. .... **"marital property"** means all property acquired by either spouse subsequent to the marriage except:
 (1) Property acquired by gift, bequest, devise, or descent;
 (2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;
 (3) Property acquired by a spouse after a decree of legal separation;
 (4) Property excluded by valid written agreement of the parties; and

 (5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.
 3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of coownership.... The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section.

personal injury awards as marital or nonmarital: Arkansas, Colorado, District of Columbia, Illinois, Iowa, Kansas, Michigan, Missouri, Nebraska, Pennsylvania, and Vermont. Blumberg, § 23.08[1][c] (main text and April 1991 cum.supp.)[2]

The second method, the "analytic" approach, "asks what the award was intended to replace...." *Johnson,* 317 N.C. 437, 346 S.E.2d at 435; Blumberg, § 23.08[1][b]. Under the analytic approach, "the purpose for which the recovery is received controls its classification; a recovery, or portion thereof, being classified as that which it is intended to replace. To the extent the recovery compensates for losses to the marital estate, it is marital property. To the extent the recovery compensates for losses to a spouse's separate estate, it is his or her separate property." *Bandow v. Bandow,* 794 P.2d 1346, 1348 (Alaska 1990) (citations omitted).[3]

Thus, although both the mechanistic and analytic approaches would require a trial court to apply the language of § 452.330 to make its determination that a personal injury recovery is marital or nonmarital proper-

ty, a court using the analytic approach would engage in the intermediate step of identifying that which the recovery replaces.

Community property states originally followed the mechanistic approach; now, with the exception of California, all community property states have adopted the analytic approach. *Weisfeld,* 545 So.2d at 1345; Blumberg, § 23.08[1][b].[4] Moreover, the analytic approach to examining personal injury recoveries is gaining adherents among equitable distribution states. The method has been adopted in Alaska, Georgia, Minnesota, Montana, New Jersey, New York, North Carolina, and Rhode Island.[5]

Our supreme court has not been called on to determine if personal injury recoveries are marital or nonmarital property under § 452.330; thus we have no opinion directly on point to advise us which approach that court would require. As stated above, based on several court of appeals opinions, numerous authorities categorize Missouri as an adherent to the mechanistic approach to classifying a personal injury award as marital or nonmarital. *See, e.g.,*

---

**2.** Professor Blumberg cites to the following opinions. *Liles v. Liles,* 289 Ark. 159, 711 S.W.2d 447 (1986); *Marriage of Fjeldheim,* 676 P.2d 1234 (Colo.App.1983); *Boyce v. Boyce,* 541 A.2d 614 (D.C.1988); *In re Marriage of Dettore,* 86 Ill.App.3d 540, 42 Ill.Dec. 51, 408 N.E.2d 429 (1980); *Gan v. Gan,* 83 Ill.App.3d 265, 38 Ill. Dec. 882, 404 N.E.2d 306 (1980); *In re McNerney,* 417 N.W.2d 205 (Iowa 1987); *Matter of Marriage of Powell* 13 Kan.App.2d 174, 766 P.2d 827 (1988); *Heilman v. Heilman,* 95 Mich.App. 728, 291 N.W.2d 183 (1980); *Jobe,* 708 S.W.2d 322; *Gonzalez,* 689 S.W.2d 383; *Trapani,* 684 S.W.2d 500; *Nixon,* 525 S.W.2d 835; *Maricle v. Maricle,* 221 Neb. 552, 378 N.W.2d 855 (1985); *Platek v. Platek,* 309 Pa.Super. 16, 454 A.2d 1059 (1982); *Condosta v. Condosta,* 136 Vt. 360, 395 A.2d 345 (1978).

**3.** A third method, the unitary approach, has been identified by some authorities. *See, e.g., Weisfeld v. Weisfeld,* 545 So.2d 1341, 1346 (Fla. 1989). Under the unitary approach, the entire award is the separate property of the injured spouse. *Id.* The *Weisfeld* court identifies Maryland [*Unkle v. Unkle,* 305 Md. 587, 505 A.2d 849 (1986)] and Utah [*Izatt v. Izatt,* 627 P.2d 49 (Utah 1981)] as jurisdictions following the unitary approach. 545 So.2d at 1346. Blumberg categorizes the unitary approach as a sub-set of the analytic approach, § 23.08[1][b] at 23–115.

To the *Weisfeld* court's short list of adherents, Blumberg would add Wisconsin [*Krebs v. Krebs,* 148 Wis.2d 51, 435 N.W.2d 240 (1989)] and, possibly, Delaware [*Gloria B.S. v. Richard G.S.,* 458 A.2d 707 (Del.Fam.Ct.1982)] and Oregon [*Marriage of Bull,* 48 Or.App. 565, 617 P.2d 317 (1980)]. Blumberg, § 23.08[1][b] (main text and April 1991 cum.supp.).

**4.** The *Weisfeld* court and Blumberg direct our attention to *Jurek v. Jurek,* 124 Ariz. 596, 606 P.2d 812 (1980); *Rogers v. Yellowstone Park Co.,* 97 Idaho 14, 539 P.2d 566 (1974); *Placide v. Placide,* 408 So.2d 330 (La.Ct.App.1981); *Frederickson & Watson Constr. Co. v. Boyd,* 60 Nev. 117, 102 P.2d 627 (1940); *Luxton v. Luxton,* 98 N.M. 276, 648 P.2d 315 (1982); *Graham v. Franco,* 488 S.W.2d 390 (Tex.1972). Blumberg additionally cites *Brown v. Brown,* 100 Wash.2d 729, 675 P.2d 1207 (1984); *Krebs v. Krebs,* 148 Wis.2d 51, 435 N.W.2d 240 (1989).

**5.** *See Bandow,* 794 P.2d 1346; *Campbell v. Campbell,* 255 Ga. 461, 339 S.E.2d 591 (1986); *Van de Loo v. Van de Loo,* 346 N.W.2d 173 (Minn.App.1984); *Marriage of Blankenship,* 210 Mont. 31, 682 P.2d 1354 (1984); *Landwehr v. Landwehr,* 111 N.J. 491, 545 A.2d 738 (1988); *Rich v. Rich,* 126 Misc.2d 536, 483 N.Y.S.2d 150 (Sup.Ct.1984); *Johnson,* 317 N.C. 437, 346 S.E.2d 430; *Kirk v. Kirk,* 577 A.2d 976 (R.I.1990).

*Weisfeld,* 545 So.2d at 1344; *Johnson,* 346 S.E.2d at 435; Blumberg, § 23.08[1][c]. Despite these various pronouncements, we believe the appellate courts of Missouri, including the supreme court, have on several occasions engaged in replacement analysis in determining whether property is marital or nonmarital.

For example, in *Sherman v. Sherman,* 740 S.W.2d 203 (Mo.App.1987), the western district held that the trial court erred in characterizing as marital property the husband's post-dissolution disability benefits from a private insurance policy. The court distinguished the husband's benefits under his disability policy, which "was not derived as an incident of his employment," from his pension plan benefits.[6] Before determining whether the disability benefits were marital or nonmarital under § 452.330, the court engaged in replacement analysis and concluded the disability benefits were "a substitute for the husband's lost earnings occasioned by his inability to work, and are the same as post-dissolution earnings which are specifically non-marital property...." 740 S.W.2d at 207.

This court, citing *Sherman,* has stated that if a wife's post-dissolution monthly $250 payments were disability rather than pension payments, they would be nonmarital property because the phrase *disability* payments "connotes money representing lost earnings occasioned by an inability to work...." *In re Marriage of Medlock,* 749 S.W.2d 437, 441 (Mo.App.1988). Thus, this court also classifies disability benefits as marital or nonmarital property depending on the characterization of that which they replace.

In a case involving workers' compensation disability benefits, the eastern district specifically adopted the analytic approach. In *Pauley v. Pauley,* 771 S.W.2d 105 (Mo. App.1989), the husband, injured during the marriage, received a lump sum workers' compensation payment after his separation from his wife but before the divorce.[7] At the time of the divorce, the husband had pending a workers' compensation Second Injury Fund claim, which apparently arose from the same injury that resulted in the lump sum payment.[8]

The court did not resolve *Pauley* solely on the basis of the date on which the two workers' compensation claims arose or when the awards were made; rather the court held that the trial court should classify the awards as marital or nonmarital after determining what they replaced, i.e., to what extent did they "compensate husband for future loss of earnings that have accrued since the dissolution of the parties' marriage." 771 S.W.2d at 109–110. Faced with an incomplete record, the court remanded the case to the trial court "to determine what portion of husband's awards are marital property subject to equitable distribution in accordance with the analytic approach...." *Id.* at 110.

In *Wilk v. Wilk,* 781 S.W.2d 217 (Mo. App.1989), the eastern district, again faced with an inadequate record, cited *Pauley* and remanded the case to enable the trial court to make additional findings "regarding whether husband's workers' compensation claim compensates for loss of earnings during marriage or compensates for loss of earnings which accrued since the dissolution of the marriage." *Wilk,* 781 S.W.2d at 223.

In adopting the analytic approach, the *Pauley* court relied on appellate court opinions from Alaska, Maine, Maryland, and

---

**6.** In *Kuchta v. Kuchta,* 636 S.W.2d 663 (Mo.banc 1982), the court recognized that "a pension is not earned on the last day of employment prior to retirement, but 'is a form of deferred compensation which is attributable to the entire period in which it was accumulated.'" *Id.* at 665, quoting *Shill v. Shill,* 100 Idaho 433, 599 P.2d 1004 (1979). The *Kuchta* court pointed out that "many potential pension benefits have been and will be created by the *joint* efforts of both spouses and may be treated as 'marital property.'" 636 S.W.2d at 665 (emphasis in original).

**7.** Apparently the separation was one in fact but not by decree.

**8.** Also pending at the time of trial was the husband's personal injury claim. The trial court awarded one-half of any recovery to the wife. The husband apparently did not appeal from that order.

Florida.[9] However, the *Pauley* court was not the first Missouri appellate court to use some type of replacement analysis in applying § 452.330. *See, e.g., Sherman,* 740 S.W.2d 203, *Medlock,* 749 S.W.2d 437, *Kuchta,* 636 S.W.2d 663, and *Hoffmann v. Hoffmann,* 676 S.W.2d 817 (Mo.banc 1984).

In *Hoffmann,* the supreme court addressed the issue of whether certain corporate stock "was wholly 'acquired' prior to the marriage." *Id.* at 823. "The interpretation given to the term 'acquired' determines whether the marital unit receives any portion of the appreciated value of the property which is due to general economic conditions." *Id.*

One aspect of *Hoffmann* germane to the case before us is the supreme court's rejection of the "inception of title" theory as the proper means of determining when the property was "acquired." Under the inception of title approach, property is classified as marital or nonmarital "at the moment title is taken." *Id.* at 824. In place of the inception of title theory, the court adopted the "source of funds" rule under which property is classified as marital or nonmarital according to "the source of funds financing the purchase." *Id.* at 824.

We believe the inception of title theory, with its emphasis on identifying a particular "moment," is analogous to a "mechanistic" or "literal" approach to applying § 452.330 to determine whether property is marital or nonmarital. The source of funds theory, on the other hand, is a form of replacement analysis in that under it the question of when property was acquired is resolved by first analyzing the character of the funds which the acquired property replaces.

▮ The approach taken by the courts in *Hoffmann, Kuchta, Pauley, Wilk, Sherman,* and *Medlock* indicates to us a growing preference on the part of our supreme court and all districts of the court of appeals for use of replacement analysis in the

application of § 452.330. The approach used by the courts in those cases stand in stark contrast to the mechanistic *Nixon* approach to classifying property as marital or nonmarital. In *Nixon* the eastern district engaged in a literal application of the statutory definition of *marital property.* The court stated that the phrase *all property* in § 452.330 "includes the property acquired by respondent as a result of the settlement of his personal injury action, and all increases in value thereof." The court noted that none of the specified exceptions listed in § 452.330 was applicable. 525 S.W.2d at 839.

In three subsequent opinions, the eastern district simply followed *Nixon* in deciding whether a personal injury recovery was marital or nonmarital. *McClement,* 681 S.W.2d at 502; *Trapani,* 684 S.W.2d at 503; *Gonzalez,* 689 S.W.2d at 386. In *Jobe,* this court, after noting the appellant made no objection to the trial court's classification of his personal injury award as marital, stated its conclusion that the "classification was proper" and cited as authority *McClement.* 708 S.W.2d at 325. In *Zimmer,* the western district, after listing all the above cited progeny of *Nixon,* simply stated "we will not depart from [*Nixon*] in this case." 770 S.W.2d at 515.

We believe the case before us provides an appropriate occasion for a departure from the literal, "mechanistic" *Nixon* approach in favor of replacement analysis, or the "analytic" approach to applying § 452.330 in a case involving a personal injury recovery. We perceive a trend among recent opinions of the various districts of the court of appeals and the Missouri Supreme Court that indicates a preference for replacement analysis in the application of § 452.330 to decide whether property such as workers' compensation benefits, disability payments, and pension income are marital or nonmarital. We see no rational reason why application of § 452.330 to a personal injury award should be approached in

---

**9.** The *Pauley* court relied on *Miller v. Miller,* 739 P.2d 163 (Alaska 1987); *Cummings v. Cummings,* 540 A.2d 778 (Me.1988); *Queen v. Queen,* 308 Md. 574, 521 A.2d 320 (1987); and *Weisfeld v. Weisfeld,* 513 So.2d 1278 (Fla.App.1987). Af-

ter the eastern district filed its opinion in *Pauley,* the Florida Supreme Court published its opinion in *Weisfeld v. Weisfeld,* 545 So.2d 1341 (Fla.1989).

a different manner. A trial court's use of replacement analysis would provide for "the most equitable distribution of property." *See Hoffmann,* 676 S.W.2d at 825.

The trial court's statements that the annuity payments represent the husband's future lost wages and earning capacity indicates to us that the trial court was engaging in a replacement analysis to make its determination. However, as the wife correctly argues, there is not sufficient evidence in the record to support the conclusion that the post-dissolution annuity payments represent *only* future lost wages and earning capacity of the husband. This shortcoming, however, does not constitute reversible error. In a court-tried case, a correct decision will not be disturbed by an appellate court because the trial court gave a wrong or insufficient reason for the decision. *Fesperman v. Silver Dollar City, Inc.,* 796 S.W.2d 384, 387–88 (Mo.App. 1990). Our primary concern is the correctness of the result the trial court reached. *Board of Regents v. Harriman,* 792 S.W.2d 388, 393 (Mo.App.1990). Thus we will affirm the judgment if the result was correct on any tenable basis. *Johnson v. Gregg,* 807 S.W.2d 680, 685 (Mo.App.1991). We conclude the evidence would support a trial court determination that the husband's post-dissolution annuity payments are nonmarital.

The 1982 settlement proceeds replaced the recoveries the husband and the wife would have received had they pursued their respective claims to a successful adjudication. Only a small portion of the settlement funds would have been for the husband's past lost income (the difference between his lost earnings and any workers' compensation disability payments he received to the date of the settlement). And we agree with the wife that only a relatively small portion of the settlement proceeds would be attributable to the husband's lost earning capacity. Although under § 287.-200, RSMo 1978, the husband would have been entitled to lifetime disability payments in an amount based on his earnings on the date of the injury, given the evidence of his pre-injury work and income history, it is difficult to justify a conclusion that the settlement was solely intended as compensation for his future lost earning capacity.[10]

In arguing that the trial court erroneously concluded the annuity payments represented only the husband's future lost wages and earning capacity, the wife correctly states in her brief, "As a personal injury settlement, the annuities could, and did, represent compensation for intangibles such as pain and suffering, lost enjoyment of life, and loss of consortium." Conspicuous by its absence from the wife's list, however, is reimbursement of medical expenses as an item of compensation covered by the settlement.

From the settlement conference transcript, we know that no part of the proceeds replaced the husband's medical or hospital expenses incurred prior to the settlement because the workers' compensation insurance carrier paid all such expenses and gave up its subrogation rights to recover those payments from the settlement proceeds. However, the settlement conference transcript makes it clear that post-settlement medical expenses were a major concern of the participants, including the judge.

The wife admits the husband was permanently and totally disabled, and the record supports the conclusion that, had he pursued his workers' compensation claim, his disability would have been determined to be permanent and total. Thus, under § 287.140, RSMo 1978, he would have been entitled to "such medical, surgical and hospital treatment, including nursing, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury." Because the 180–day limitation of § 287.140, RSMo 1969, was removed in

---

**10.** By *loss of earning capacity* we mean not only actual loss of wages but also loss of "the pleasure and satisfaction one receives from working, the ability to perform one's work without pain, the economic value of one's time ... and even the ability to perform work around the house." *Mo. Damages* § 5.1 (MoBar 1988).

1977, the benefits mandated by § 287.140 would have been available to the husband for the duration of his disability, conceivably for the remainder of his life. Settlement proceeds replaced not only these substantial workers' compensation medical benefits, but also any medical expenses recovery the husband might have had in his personal injury suit.

Also as part of the settlement, the wife gave up her loss of consortium claim. Although the settlement court's comments concerning the wife's lump-sum payment suggest the court viewed at least a portion of the $150,000 as a replacement for expended marital funds, the amount awarded the wife for her loss of consortium could have been a substantial sum because of the added burdens on her of caring for a spouse who had suffered a catastrophic injury. *See Manning v. Jones*, 349 F.2d 992, 994–95 (8th Cir.1965); *Morrison v. Ted Wilkerson, Inc.*, 343 F.Supp. 1319, 1329–30 (W.D.Mo.1971).

Thus we believe the record supports the conclusion that the lump-sum and monthly payments to the husband and the wife, although intended in part as a replacement for lost wages and earning capacity, were intended primarily to compensate for post-settlement medical expenses, the husband's past and future pain and suffering, and the wife's loss of consortium. Neither party challenges the trial court's determination that the lump-sum payments and annuity payments received by both parties prior to the dissolution were marital property, and the husband does not challenge the characterization of the wife's post-dissolution payments as nonmarital. Thus it is not necessary to analyze the pre-dissolution payments or the wife's post-dissolution payments in order to ascertain the respective aspects of each party's claims in the Union Electric lawsuit replaced by settlement funds.[11] The issue before us is limited: whether the post-dissolution annuity payments to the husband replaced only his post-dissolution noneconomic and economic damages and, therefore, were properly designated as nonmarital property by the trial court.

The transcript of the settlement conference and the structure of the settlement agreement itself support the conclusion that the husband's post-dissolution annuity payments represent only his post-dissolution noneconomic and economic losses. The wife, acting on her own behalf and as guardian of the husband, agreed to separate annuity payments to him, to her, and to their son. The wife requested a substantial lump-sum award (at least a portion of which could be attributable to reimbursement of marital expenses), but the court did not approve the settlement until the parties agreed to a payment of more than $306,000 "to Ruth Ann Mistler as guardian of the estate of Jerry Dennis Mistler for his use and benefit." The settlement court did not appoint a guardian ad litem for the husband, apparently believing there was no "inappropriate allocation of the funds of the proposed settlement" between the wife individually and the wife acting as the husband's guardian. The husband's post-settlement medical expenses received much attention from the participants and the court.

From reviewing the settlement conference transcript and the nature of the settle-

---

**11.** Under the replacement analysis or "analytic" approach as it is employed in other states, a personal injury damage award generally is allocated among three components:

> (1) Separate property of the injured spouse includes:
>> (a) noneconomic compensatory damages for pain, suffering, disfigurement, disability, and loss of ability to lead a normal life and
>> (b) economic damages which occur subsequent to the termination of the marriage, including the amount of the award for post-dissolution medical expenses and loss of future wages or future earning capacity.

> (2) Separate property of the noninjured spouse includes loss of consortium.
> (3) Marital property subject to distribution includes the amount of the award for lost wages or lost earning capacity during the marriage and medical expenses paid out of marital funds.

*See Johnson*, 346 S.E.2d at 436; *Weisfeld*, 545 So.2d at 1345. We do not adopt this allocation scheme in its entirety; our disposition requires us to hold only that compensation attributable to the husband's post-dissolution noneconomic and economic damages is nonmarital property.

ment, the trial court could have concluded that the lump-sum payments and pre-dissolution annuity payments to each party more than compensated the marital unit for its losses during the marriage and that the husband's post-dissolution payments were attributable solely to his post-dissolution economic and noneconomic damages. Thus we find no error in the trial court's determination that the post-dissolution annuity payments to the husband were nonmarital. That the trial court assigned a wrong reason for its conclusion is of no consequence. *See Fesperman,* 796 S.W.2d at 387–88.

*Failure to Consider Social Security*

■ In her challenge to the trial court's property division, the wife also complains the trial court was in error because it failed to take into account the husband's monthly social security disability income. While it is true that social security benefits or potential benefits are economic factors to be considered in the disposition of marital property, *Rudden v. Rudden,* 765 S.W.2d 719, 720 (Mo.App.1989), the record refutes the wife's argument. When the husband objected to the wife's attempt to adduce evidence of the "present value" of the husband's social security benefits, the trial court said:

> I don't know that we need to arrive at a present value. I think just—just the monthly payment is enough to show the income. The parties' income is relevant, I think, even in division of property.

It is clear that the trial court understood its obligation to consider the husband's social security income in dividing the property. This argument is without merit.

*Inequitable Division of the Annuity Payments*

The wife also contends that the trial court's division of the annuity payments was "so inequitable as to constitute an abuse of discretion." At trial, the wife presented the testimony of an economist who placed the present value of the husband's annuity at $2,902,798 and the present value of the wife's annuity at $1,284,507. The wife now argues that the present values of the annuities, combined with the values of each party's marital

property (as set out in the statement of facts), provide her with property worth $1,599,887 (33 percent of the total) and the husband with property worth $3,214,738 (67 percent of the total).

The wife's argument is moot because of our conclusion that the trial court did not err in determining that the post-dissolution annuity payments are nonmarital property. The trial court properly set aside nonmarital property to each spouse before dividing the marital property. Section 452.330.1, RSMo 1988.

■ We make the following observation. The trial court's division of property does not have to be equal; it must be fair and equitable and take into account the factors enumerated in § 452.330.1. *Hayes v. Hayes,* 792 S.W.2d 428, 431 (Mo.App. 1990). However, the factors or considerations in § 452.330.1 are not exclusive. *In re Marriage of Harrison,* 657 S.W.2d 366, 370 (Mo.App.1983). In *Harrison,* the disputed marital property consisted of two parcels of real estate. This court ordered one parcel to be awarded to the wife and one to the husband. As a result of the division, 88 percent of the equity in the marital realty went to the wife who had suffered severe and permanent injuries in a motor vehicle accident. Concerning the division of the marital property, this court stated:

> [T]here is no formula respecting the weight to be given the relevant factors which a court may consider.... Even if it were otherwise the phrase "economic circumstances," which is part of the language of § 452.330.1(3), is broad enough to include the parties' capacity to work and earn.... [T]he law requires provision for a potentially disabled spouse by award of marital property, if that is practicable.

*Id.* at 370–71.

■ Disparity in the value of marital property awarded each spouse is justified if the relevant factors, statutory or otherwise, justify an unequal division. *Hayes,* 792 S.W.2d at 431; *Wilk,* 781 S.W.2d at 222. Considering the catastroph-

ic results of the injury to the husband, we are convinced that, even if the annuity payments were marital property, we would not disturb a decision that awarded the husband 67 percent of the assets and the wife 33 percent.

*Failure to Offset Expenditures Made by the Wife*

 Also under Point I, the wife contends that the trial court's property division failed to compensate her for payments she made to preserve marital assets when there was evidence that the husband made no payments to preserve marital assets and had, in fact, depleted marital assets.

The trial court found that, since the parties' separation, the wife had paid "all costs in maintaining the family home including maintenance, taxes and insurance" and "all costs in making payments on the Shelby County farm designated as the Ruth Ann Mistler farm." In addition to these trial court findings, the wife points to evidence of the husband's expenditures. When he was confronted with records showing that checks drawn on his account from December 1986 through September 1989 totalled $218,803, the husband said he had spent the money "for my living expenses." He said he did not know what had caused a reduction of approximately $8,500 in his trust account (from $184,463 to $175,940) between March 30, 1990, and the April 23, 1990, trial date. As a result of some motor vehicle trades the husband received $6,500 in cash which, he testified, went "in my billfold."

The wife argues "this situation is one in which set-off was appropriate, and the court's failure to make any allowance for such a set-off was an abuse of the court's discretion." In support she cites *Fornachon v. Fornachon*, 748 S.W.2d 705, 708 (Mo.App.1988); *In re Marriage of Layton*, 687 S.W.2d 214, 216 (Mo.App.1984); and *Fischer v. Seibel*, 733 S.W.2d 469, 475 (Mo.App.1987). Those cases authorize a trial court to make set-offs; they do not compel that action.

After reviewing the record, we conclude that the trial court did not abuse its discretion when it failed to compensate the wife on account of the expenditures described above. Regarding the wife's payments that she claims were "to preserve marital assets," the record reveals there were no mortgage payments on the marital home; the only financial burdens were taxes, insurance, and maintenance. During the parties' separation, the wife had possession of the marital home, she used marital funds to make the mortgage payments on the "Ruth Ann Mistler farm," and she and her brother operated both her farm and the husband's farm without sharing the income with the husband.

Regarding the husband's expenditures, the record supports a conclusion that, although he could not provide a specific accounting of certain expenditures, the husband did not "squander" marital assets as that word is used in *Calia v. Calia*, 624 S.W.2d 870, 872 (Mo.App.1981) (husband emptied joint account shortly before wife filed for dissolution); *In re Marriage of Faulkner*, 582 S.W.2d 292, 295–96 (Mo.App.1979) (wife completely depleted three funds containing marital property); and *Daniels v. Daniels*, 557 S.W.2d 702, 704–05 (Mo.App.1977) (two weeks before trial husband withdrew $9500 from credit union account, leaving balance of $469). We find no error in the trial court's failure to make a set-off allowance.

### POINT II: CHILD SUPPORT

The trial court ordered the husband to pay the wife $500 a month as support for the parties' son Jared. The court also ordered the husband to pay one-third of the son's "reasonable tuition." In her second point on appeal, the wife challenges the amount of the award, contending the trial court "based the award on the educational expenses for the child when educational expenses are not part of the formula for determining child support...." The wife also contends the court erred in its failure to award child support retroactively to the filing of the petition.

Section 452.340, RSMo cum.supp.1990, governing payment of child support, states in pertinent part:

1. In a proceeding for dissolution of marriage ... the court may order either or both parents owing a duty of support to a child ... to pay an amount reasonable or necessary for his support, including an award retroactive to the date of filing of the petition ... after considering all relevant factors, including:

(1) The financial needs and resources of the child;

(2) The financial resources and needs of the parents;

(3) The standard of living the child would have enjoyed had the marriage not been dissolved;

(4) The physical and emotional condition of the child, and his educational needs.

In 1989, the Missouri General Assembly added subsections 7 and 8 to § 452.340. In subsection 7, the legislature directed the supreme court to adopt, not later than October 13, 1989, a rule establishing guidelines for awards of child support. Subsection 8 provides:

Beginning October 13, 1989, there shall be a rebuttable presumption ... that the amount of the [child support] award which would result from the application of the guidelines established pursuant to subsection 7 of this section is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case, after considering all relevant factors including the factors set out in subsection 1 of this section, shall be sufficient to rebut the presumption in the case.

In response to the legislative mandate of § 452.340.7, the supreme court adopted Rule 88.01 and Civil Procedure Form 14 on October 2, 1989, both to be mandatorily effective April 1, 1990. Rule 88.01 essentially paraphrases § 452.340.1 and § 452.-340.8.[12] Form 14 includes a worksheet to assist in calculation of a presumed child support amount and a schedule of dollar amounts of child support as determined by the number of children and the parties' combined monthly gross income.

By the wife's Form 14 calculations, the husband's presumed child support obligation would be $960 a month. The husband's calculations showed his presumed obligation to be $723.60. The trial court, however, in ordering the husband to pay $500 a month plus one-third of the child's reasonable tuition costs, stated in its finding number 38 that "the 'presumed child support amount' calculated pursuant to Civil Procedure Form 14 would be unjust or inappropriate inasmuch as the child of the parties has a substantial financial resource for his education...." [13]

■■ The trial court's finding number 38 rebutted the presumption that the presumed child support amount calculated by use of Form 14 was correct. § 452.340.8; Rule 88.01(e). The fact that the trial court stated, as the sole reason for its finding, that the child had available "a substantial financial resource for his education" does

**12.** Rule 88.01 states:

When determining the amount of child support to order, a court ... shall consider all relevant factors, including:

(a) the financial resources and needs of the child;

(b) the financial resources and needs of the parents;

(c) the standard of living the child would have enjoyed had the child not been dissolved;

(d) the physical and emotional condition of the child; and

(e) the educational needs of the child. There is a rebuttable presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is the amount of child support to be awarded in any judicial ... proceeding for dissolution of marriage, legal separation, or child support. It is sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is correct if the court ... enters in the case a written finding or a specific finding on the record that the amount so calculated, after consideration of all relevant factors, is unjust or inappropriate.

**13.** The parties apparently agree that the "substantial financial resource" referred to by the court is the child's annuity payments that resulted from the settlement of his father's personal injury claim. We, likewise, believe the "substantial financial resource" to be the annuity payments.

not compel a conclusion that the court lapsed into error, legal or arithmetic.

■ The wife, however, calls our attention to Comment B to Form 14 which states, "Educational expenses such as college, private schools, and tutoring are not factored into the attached schedule." Comment B, the wife argues, "clearly demonstrates that educational expenses are *not* to be considered in establishing a presumed child support amount under Rule 88.01." This argument is little more than a restatement of Comment B. The presumed child support amount calculated according to Form 14 establishes a starting point from which a trial court may make adjustments to accommodate a child's special needs, such as a college education.

The wife also argues, in effect, that if college expenses are not reflected in the Form 14 schedule amounts, then a child's college expenses and money paid to that child and earmarked for a college education should not be used to adjust an award calculated according to Form 14. This argument is not in accord with the law and the facts of this case.

The financial needs and resources of the child and both parents are factors to consider in fashioning a child support award. § 452.340.1(1) & (2); Rule 88.01(a) & (b). The needs of the child include those related to education. § 452.340.1(4); Rule 88.01(e). Thus, although college expenses are not a factor in the Form 14 schedule, those expenses and a child's resources for college are appropriate factors for a court to consider in determining an award. Comment B to Form 14 does not prohibit the court from adjusting a presumed child support award upon consideration of the child's college expenses and resources.

At the time of the trial, the parties' son was a high school senior who was planning to attend Central Missouri State University. One month before trial, on his 18th birthday, he had received $13,000, the first of the annuity payments due him under the settlement of his father's claims. On his birthday the following year, March 28, 1991, he would receive $14,000; on his birthday in 1992, $15,000; in 1993, $16,000; and in 1995, $50,000.

The transcript of the 1982 settlement conference makes clear that the child's annuity payments, although intended to provide him a college education, were not conditioned on his attending college. Thus the dissolution court might have concluded that the annuity payments were the child's unrestricted financial resource and, therefore, could be considered to reduce a child support award. Or the trial court might have concluded that the amount of the annuity payments exceeded the child's educational expenses and, thus, the excess could be used to reduce the award. That the court's statement in finding number 38 might be read to suggest that the child's annuity payments were restricted to college use does not annul a correct result.

■ The wife claims the trial court abused its discretion in not awarding child support retroactively to June 27, 1988, the date the husband filed his dissolution petition. She argues that because the son's annuity payments did not commence until March 1990, the trial court should have awarded child support retroactively for the years 1988 and 1989 in amounts calculated in accordance with the Form 14 guidelines. She asserts she paid all of the child's expenses during the period for which she seeks retroactive child support.

We find no abuse in the trial court's refusal to award child support retroactively. The language of § 452.340.1 is permissive, not mandatory: a trial court "may order" child support "including an award retroactive to the date of filing the petition." Nothing in § 452.340.8 or Rule 88.01 creates a presumption that an award calculated under the Form 14 formula is to be retroactive.

■ Because of the husband's injury, the child received social security benefits of $471 a month until his 18th birthday in March 1990. Although they were not part of the marital estate, those benefits could be considered in the determination of child support payments. *Wilk*, 781 S.W.2d at 223; *Warren v. Warren*, 601 S.W.2d 683, 688 (Mo.App.1980).

Pursuant to an agreement in an earlier dissolution action, the husband paid $500 a month child support from January to September 1988, and on April 27, 1989, the trial court ordered the husband to pay $500 per month child support retroactive to March 27, 1989. The husband testified he paid the support ordered by the court. Thus the record contradicts the wife's claim that she alone provided the child's support during the pendency of this action.

The trial court did not abuse its discretion in failing to order the retroactive child support.

## POINT III: ATTORNEY FEES

By her third and final point, the wife claims the trial court erred in its refusal to order the husband to pay her attorney fees. Section 452.355.1 permits, but does not require, a trial court to award attorney fees. As a general rule, the parties to a dissolution are to pay their own attorney fees. *Echele v. Echele*, 782 S.W.2d 430, 441 (Mo.App.1989). Only on a showing that the trial court abused its broad discretion in ordering, or refusing to order, one party to a dissolution to pay the attorney fees of the other party, will an appellate court overturn the trial court order. *Id.* at 440. To show an abuse of discretion by the trial court in its attorney fee award, the complaining party has the burden to show that the order is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of deliberation." *Ederle v. Ederle*, 741 S.W.2d 883, 885 (Mo.App.1987). Our review of the record convinces us that the wife had not met that burden.

In support of her contention that the trial court abused its discretion, the wife points to the husband's failure to appear for the second day of trial in October 1989, an action that resulted in a six-month delay in the proceedings; she charges that the husband paid a substantial portion of his legal fees from marital funds while she did not; and she asserts that the husband is "better able to pay" her attorney fees.

The record reveals that the wife sought sanctions, costs, and attorney fees arising out of the husband's failure to appear for the second day of trial in October 1989. The court apparently accepted the husband's argument that attorney preparation for the October 1989 trial would be useful upon resumption of the trial and consequently ordered the husband to pay $320 as reimbursement for the wife's attorneys' time in court on the day he did not appear. The wife presents no evidence or argument to persuade us that the trial court's action was erroneous.

The wife's argument that the husband paid his attorney fees from marital resources is, in effect, the same argument she presented in her claim that the husband squandered marital funds and she should have received a set-off allowance to reimburse her for those expenditures. We have disposed of that complaint under Point I. Regarding the wife's argument that the husband is better able to pay her attorney fees than she, we note that the trial court awarded substantial assets to the wife from which she should be able to pay her attorneys. *See Wilk*, 781 S.W.2d at 224.

The record demonstrates that the trial court proceedings were unduly protracted and that neither side is blameless for that situation. *See Gourley v. Gourley*, 811 S.W.2d 13, 23 (Mo.App.1991). The trial court did not abuse its discretion in refusing to order the husband to pay the wife's attorney fees.

We affirm the judgment.

FLANIGAN, C.J., and PARRISH, P.J., concur.