In re the MARRIAGE OF Gerald V. LILJEDAHL and Judith A. Asher

Gerald V. LILJEDAHL, Petitioner–Appellant,

v.

Judith A. ASHER, Respondent–Respondent.

No. 20537.

Missouri Court of Appeals, Southern District, Division Two.

Dec. 31, 1996.

Motion for Rehearing or Transfer Denied Jan. 16, 1997.

Robert R. Paulson, II, Branson, for petitioner–appellant.

Harold F. Glass, Schroff, Glass & Newberry, P.C., Springfield, for respondent–respondent.

SHRUM, Judge.

This is a dissolution of marriage case in which Husband contends that the trial court erred when it ordered Husband to pay Wife modifiable maintenance for twelve months. We agree. The trial court's finding that Wife was unable to support herself through appropriate employment due to "her present mental condition" is not supported by sub-

stantial evidence; hence the judgment awarding Wife maintenance cannot be affirmed. We reverse.

Husband and Wife were married October 2, 1993, separated November 12, 1994, and their marriage was dissolved on September 12, 1995. No children were born of their marriage.

Wife, age 43 at the time of trial, is 19 years younger than Husband. Wife's employment experience includes nine years at a law firm, followed by employment by the federal government, first at the Internal Revenue Service and then as a court reporter for the hearings and appeals arm of the Social Security Administration (SSA).

Husband is a licensed attorney who left his position as a senior staff attorney with the Office of Hearings and Appeals, SSA in 1987, retiring with a fully vested pension from that position. He moved to southwest Missouri and opened a private practice specializing in social security law. He met Wife while she worked for the SSA, they "started having a relationship," and ultimately were married.

The trial court dissolved the marriage and divided total net marital assets valued at $27,065 as follows: $14,790 (55%) to Husband and $12,275 (45%) to Wife. Each party's non-marital real estate was set aside to Husband and Wife. Husband was ordered to pay a debt of approximately $7,000 owed on an automobile awarded to Wife and to pay $2,000 toward Wife's attorney fees. Wife was awarded $1,000 per month maintenance for 12 months by a modifiable order. In addition to finding that Wife could not meet her reasonable needs through her property, the trial court found that Wife was not able to support herself through appropriate employment due to "her present mental condition." Summarizing the evidence of her mental condition, the court noted that Wife "currently takes at least three prescription medications and sees a psychiatrist monthly and a psychologist weekly, although no evidence was presented as to [Wife's] current diagnosis other than 'depression' nor as to her prognosis." In its findings, the trial

court characterized the amount and duration of maintenance as sufficient "to pay most of her outstanding debts and to train or rehabilitate herself to re-enter the job market."

To resolve the issues presented by this appeal, it is necessary to consider additional background facts. Husband testified that prior to their marriage, apparently in 1990 or 1991, he learned that Wife had recently been in a Springfield hospital for "drug detoxification[,]" that she was suffering from depression, and had been fired from her job as a reporter for the SSA because of excessive absenteeism. Continuing, Husband testified that he had arranged for Wife to see a psychologist recommended by him, after which he had filed and successively prosecuted two claims for Wife. One was for disability social security and the other was a claim for her "Federal Employee Retirement System" [FERS] pension. According to Husband, the latter claim required proof of Wife's "inability to do [her] prior relevant work."

Wife's account of the successful pursuit of her disability claims differed from that of Husband.

"Q. [TO WIFE] Tell the Court briefly what the circumstances were that got this idea started of getting a disability pension.

"A. Jerry [Husband] specialized in that field and knew that it would be easy to have me take a disability, and told me of the doctors I needed to go see and what forms we needed to file. He did all that paperwork, because that's his field of expertise. He did that so that I would have more time to be with him.

"Q. ... When the process started, that is when you started doing the paperwork, were you working full-time?

"A. Yes.

"Q. In the course of the process, were you ever fired or was your employment terminated?

"A. One way of proving my disability, Jerry told me, was if I was not able to go

to work and they had to fire me, that would prove my side that I was not able to work and they could not deny that I could not work if I did not show up. It wasn't until just recently that I've heard Jerry say I was fired. He never told me that.

"Q. Well, did you, at his direction, stop going to work?

"A. Yes.

"Q. ... And then what happened next?

"A. Then my disability was approved.

"Q. ... And what was the basis of the disability as you understand it?

"A. I asked Jerry that one time, and I asked him in one word what would my disability be and he called it depression.

"Q. And did the disability finally go through before the marriage....?

"A. Yes...."

Husband's success in obtaining for Wife these benefits came despite her apparent continued ability to work.

"Q. [TO WIFE] After you quit working at the Social Security office, did you then begin to do some work for Jerry's law firm?

"A. [BY WIFE] I did. I know it was not immediately, but perhaps maybe a year afterwards when he put a computer in my house, I did the work.

. . . .

"Q. [W]hat type of work did you do?

"A. I did a lot of Jerry's legal briefs or interrogatories, deposition summaries that were lengthy and let his paralegal do the shorter letters, correspondence. I not only did work, I also made forms and changed fonts and made an actual legitimate form.

"Q. Over what period of time did you do this work for his law practice?

"A. Oh, it was over a period of a year."

Wife testified that this work required four to five hours of her time each day for five to six days of each week.

Husband knew before the marriage that Wife was a frequent user of marijuana. Moreover, her usage thereof continued after marriage, often in Husband's presence. It was a practice that Husband claimed to disapprove of, but in his words, he "tolerated" it. Wife did not dispute such testimony and readily admitted her usage of marijuana "on the average ... every day or every other day." She did suggest, however, that Husband did more than tolerate her usage. She testified that she had grown marijuana in Husband's house at Kimberling City and described Husband's involvement thusly:

"Q. How could you grow marijuana in the house?

"A. Jerry [Husband] has a room in the basement that has no windows, and Jerry, to save money, so he would not be providing me with money that I could go spend it on marijuana, me and his son decided that we would grow it with indoor lights, and we had about 30, 40 plants that lived for a year.

. . . .

"Q. What was Jerry's involvement in that growing process?

"A. Jerry taught me how to grow. He taught me about CO2. The difference between topsoil and potting soil. He taught me how plants grow, how they're germinated, how you raise them, how you prune them."

Continuing, Wife testified that when the plants matured, she and Husband's son harvested and processed the marijuana crop in Husband's house.

Husband testified that beginning in September 1994, he noticed that Wife's spending had "increased rapidly." In that time period, Wife met Richard Graves and began having sexual relations with him. Additionally, Graves furnished Wife with marijuana and also introduced her to a "hard" drug, Dilaudid, which she then used for a time. In October 1994, Wife spent a weekend in St. Louis with Graves during which she charged over $1,900 on credit cards. Wife then

agreed to spend the Thanksgiving weekend of 1994 with Husband but instead went to Texas with Graves. Husband was angered by these events and filed his petition for dissolution in December 1994.

After Husband filed his suit, the parties attempted a "probationary reconciliation" in late 1994 and early 1995. As Husband described it, this meant that Wife was never to use hard drugs again. Wife testified that the reconciliation occurred after Husband saw her with a black eye and "his heart went out to [Wife]."

During the reconciliation period, Husband trained Wife extensively in the use of a pump shotgun. Husband's instruction of Wife included how to fire the gun from the hip. He also gave Wife detailed counseling on the legal elements of self-defense.

Their attempted reconciliation failed; thus Wife was living in her home in Springfield on April 23, 1995, when Richard Graves allegedly broke into her home, whereupon Wife shot and killed him. As Wife explained it:

"Richard was going to harm me again.... Richard wanted something and I left the room for just a minute to go get what Richard wanted, but I came back with the shotgun, and he tried to take it away from me and I shot ... the gun [twice from the hip]."

Immediately after the shooting, Wife first called Husband, then 911. Wife recounted that when she told Husband about the shooting, he replied: "Good for you, I'm proud of you." Following the initial police investigation of the shooting, Husband took Wife to his home "to recover" and she remained there until mid-May 1995. During this period, Wife was physically active and believed that her marriage had been patched up. She testified that she did garden work, landscaping, housework, cleaning, and remodeling. She recounted her efforts "to fix up [Husband's] guest room for his daughter[ ]" and described how she had shopped for the items necessary to do the work described above. However, in mid-May when Husband re-turned from a trip to New York, they separated for the final time.

Asked at trial to describe her present conditions of physical and emotional health, Wife replied: "Emotionally, this year ... I've had a lot of incidents which have caused me a great deal of depression and stress and anxiety. And it has not been very good at all this year." She testified that she sees a psychiatrist once each month and a psychologist weekly, but never mentioned any other health care needs, physical or mental. Wife explained. that the psychiatrist prescribes and regulates her antidepressant medication and the psychologist provides Wife with "support and guidance." Her medications are Prozac, Fioricet (for headaches), and "pills for stress like panic attacks [which she takes only as needed]."

Wife was twice asked about her efforts to find employment. Her testimony on that subject follows:

"Q. Judy, what efforts, if any, have you made to investigate or seek employment?

"A. To begin with, I could not work full-time now or I would lose all the benefits that I have set up through Social Security. And emotionally or mentally, I am not able to be that dependable where I could work someone's hours eight to five, 40 hours a week because this has been a very overwhelming year."

. . . .

"Q [TO WIFE] Have you taken any actions to seek any employment or are you desirous of doing that at all?

"A. [BY WIFE] I am sure that I probably will have to in the future. I have too many other things pending right now. In the future I probably will try to get a part-time job sometime.

"Q. Will that impact your tax-free income?

"A. I'm able to earn so much a year without it affecting my benefits, but I have to weigh the outcome of a lot of legal issues to think about before I can think about getting a job."

Although Wife testified during cross-examination that she was "disabled" and suffered from "depression," she did so only in conclusory fashion and without adducing facts that would enable the court to assess the severity of her mental disorder. As the trial court noted, "no evidence was presented about Wife's current diagnosis other than 'depression' nor as to her prognosis."

Husband's first point maintains that the maintenance award was unsupported by the evidence because Wife failed to show an inability to support herself through appropriate employment.

■ Appellate review of a dissolution case is governed by the principles enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *See Mistler v. Mistler*, 816 S.W.2d 241, 245 (Mo.App.1991). Thus, we must affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32.

■ A trial court has broad discretion in determining the amount and duration of a maintenance award in a dissolution case, *Van Skike v. Van Skike*, 858 S.W.2d 779, 780[16] (Mo.App.1993); accordingly, maintenance awards are reviewed only for abuse of discretion. *Vehlewald v. Vehlewald*, 853 S.W.2d 944, 953[32] (Mo.App.1993).

■ Section 452.335.1, RSMo 1994, sets forth the two-part threshold test for an award of maintenance. The court must first consider whether the party requesting maintenance has sufficient property, including marital property divided during the dissolution proceedings, to provide for his or her reasonable needs. *Whitworth v. Whitworth*, 878 S.W.2d 479, 483 (Mo.App.1994). If the party requesting maintenance has insufficient property to meet his or her needs, the court then examines whether the party's reasonable needs can be met through appropriate employment. *Id.* "Maintenance can only be awarded if the requesting party can-

not meet his or her reasonable needs through property or employment." *Id.* at 483[15].

■ Courts generally have awarded maintenance in circumstances where the party seeking it " 'devoted a majority of her life to the household and maternal tasks, thereby, forfeiting the opportunity to develop occupational skills,' " or where the requesting party " 'requires further education or training to support himself,' i.e. rehabilitative maintenance." *Kovacs v. Kovacs*, 869 S.W.2d 789, 793 (Mo.App.1994) (quoting *Hurley v. Hurley*, 607 S.W.2d 169, 170 (Mo.App.1980)). " 'Justice does not require provision of support to a spouse who is or may be prepared to become self-supporting.' " *Ottmann v. Ottmann*, 829 S.W.2d 644, 647 (Mo.App.1992) (citing *Doerflinger v. Doerflinger*, 646 S.W.2d 798, 800 (Mo. banc 1983)).

■ Unemployment alone is not enough to require an award of maintenance in a dissolution case. *Wallace v. Wallace*, 839 S.W.2d 354, 357[8] (Mo.App.1992). In fact, following separation the parties are encouraged to become self-sufficient by fulfilling their affirmative duty to seek employment. *Id.*

■ A court may, in proper circumstances, impute income to a spouse according to what he or she could have earned by the use of such person's efforts to gain employment suitable to his or her capabilities. *Stewart v. Stewart*, 866 S.W.2d 154, 157 (Mo.App.1993). Even where a spouse has, with the permission and agreement of the other spouse prior to separation, voluntarily foregone employment, courts have imputed some income to the non-working spouse. *See Jensen v. Jensen*, 877 S.W.2d 131, 136 (Mo.App.1994) (citing *Boyer v. Boyer*, 567 S.W.2d 749 (Mo.App. 1978)).

■ Courts may consider the effects of the physical or mental condition of the spouse seeking maintenance on his capacity to work and earn, *see McCallister v. McCallister*, 809 S.W.2d 423, 429 (Mo.App.1991), but maintenance awards cannot be based on mere speculation as to the current or future

condition of such spouse. *May v. May*, 801 S.W.2d 728, 731 (Mo.App.1990). "Under § 452.335.1 a party must prove need before maintenance can be awarded." *Chapman v. Chapman*, 871 S.W.2d 123, 126[15] (Mo.App. 1994). "A mere request for maintenance is insufficient to support a maintenance award." *Id.* at 126[16].

▮▮▮▮ Here, Wife admitted that she quit going to work based solely on Husband's advice and not due to any physical or mental condition that affected her ability or capacity to work and support herself through appropriate employment. Wife further admitted that her non-appearance for work and ultimate termination by the SSA was merely a part of Husband's scheme to establish her eligibility for social security disability benefits and FERS pension, and thus free her to spend more time with Husband. With amazing candor, Wife claimed that she never knew the basis for her alleged disability until after the scheme succeeded, whereupon, in response to her inquiry, Husband told her it was based on "depression." However, a social security disability determination is not binding on Missouri courts, especially where, as here, the determination was more than four years before trial. *See Pemberton v. Pemberton*, 756 S.W.2d 660, 663[3] (Mo.App. 1988) (holding that social security determination made one year before divorce trial was not binding on trial court).

Furthermore, the mere existence of a mental disorder or a psychiatric diagnosis in a patient gives little clue as to the degree of mental impairment. 3A LAWYERS' MEDICAL CYCLOPEDIA § 17.26, at 52 (4th ed. 1996). As noted above, this record is devoid of any medical evidence that Wife ever exhibited symptoms or signs of depression or that her depression was not well-controlled by medication, or that her ability to function socially and occupationally was ever impaired because of depression. Moreover, Wife's assertion that she suffered from depression at the time of trial was conclusory and was unsupported by any evidence of symptoms that limited or precluded her from engaging in

appropriate employment. Indeed, there is substantial evidence to the contrary. For example, Wife testified in detail about her substantial work activities for Husband's law firm, work that she performed on an ongoing basis for over a year without any complaints or indication of limitation. Wife traveled regularly, frequently going back and forth between her home in Springfield and Husband's house in Kimberling City. During the marriage she cooked for Husband and "cleaned the house more than he did." She traveled to St. Louis and Texas with Richard Graves. Wife installed growing lights for the marijuana at Husband's house and helped plant, tend, and harvest that crop. In January through March 1995, she was physically and mentally able to successfully complete the extensive firearms training given her by Husband. Even after Graves was killed, Wife's activities continued unabated, i.e., in May 1995 Wife made repairs and improvements at Husband's home, specifically garden work, landscaping, housework, cleaning, and remodeling of the guest room. Although Wife presently takes medications, sees a psychiatrist each month and a psychologist weekly, such evidence, standing alone, does not support a finding that Wife was disabled or unable to hold appropriate employment. Regardless of what mental impairment is diagnosed, it is the inability of a person to function because of the diagnosed impairment that is critical in evaluating the alleged disability. 4 Soc. Sec. Coordinator (RIA) ¶ 30,805 (1985). In this case, Wife offered no evidence on this subject; hence the court's finding that Wife was unable to support herself through appropriate employment due to "her present mental condition" is without evidentiary support.

This is not a case where Wife's occupational skills were shelved away during the course of an extended marriage. *See, e.g., In re Marriage of Goodding*, 677 S.W.2d 332, 334 (Mo.App.1984). The marriage was of short duration. Wife offered no evidence that would support a finding that she needed training or rehabilitation in order to find and hold appropriate employment. To the con-

trary, after Wife quit working for the SSA, she kept her employment skills honed and updated by performing extensive paralegal-type work for Husband. Wife's employment history indicates she could find appropriate employment from which she could meet her needs. As Wife explained it: "Before I met Jerry [Husband] I was working and getting by like I had for 14 years living alone just raising my children and working." Moreover, we note that Wife's testimony showed an explicit reluctance to obtain full-time employment which would void her disability benefits. Under the circumstances, the trial court abused its discretion in not requiring Wife to seek employment outside the home and in awarding her maintenance.

In reaching the above conclusion, we do not ignore Wife's assertion that she was not "emotionally or mentally ... able to be ... dependable where [she] could work ... eight to five, 40 hours a week." As earlier stated, such testimony is conclusory and Wife presented no facts, i.e., testimony of signs or symptoms of mental illness, to support her claim. Additionally, Wife demonstrated her ability to function in part-time employment by the work she performed for her Husband's law firm and also at his home. Presently, Wife has a total monthly income of $1,179, of which $1,029 per month is tax free. This income is from social security, FERS pension, and child support.[1] On her income and expense statement form, Wife listed her expenses at $1,410 per month. Wife acknowledged that government regulations enable her to earn $500 per month and still retain her pension income, yet she gave no explanation of why she never sought part-time work except to say that she had "too many things pending now" and that she had "to weigh the outcome of a lot of legal issues before I can think about getting a job." Working part-time within the framework of federal regulations and earning $500 would give Wife $1,679 income per month, some $269 per month more than her listed expenses. Although Wife's expense form did not list monthly payments on debts, the $269 would be available for that purpose.

Under the circumstances, Wife failed to show that she was unable to support herself through appropriate employment; thus no substantial evidence supports the judgment. We find an abuse of the trial court's discretion in the award of maintenance. The portion of the Judgment and Order awarding Wife $1000 per month for 12 months is reversed. In all other respects the judgment is affirmed.

MONTGOMERY, C.J., and PARRISH, J., concur.

1. The child support is for Wife's son from an     earlier marriage.