Barbara REED, Appellant,

v.

Boyd REED, Respondent.

No. WD 76222.

Missouri Court of Appeals, Western District.

Dec. 31, 2013.

---

Jonathan Sternberg and William M. Quitmeier, Kansas City, MO, for appellant.

Nancy L. Jackson, Independence, MO, for respondent.

Before Division Four: JAMES E. WELSH, Chief Judge, Presiding, CYNTHIA L. MARTIN, Judge and PATRICK ROBB, Special Judge.

CYNTHIA L. MARTIN, Judge.

Barbara Reed ("Wife") appeals from the trial court's Second Amended Judgment of Dissolution. Wife contends that the trial court erred in (1) finding that there was no financial misconduct on the part of Boyd Reed ("Husband") during their marriage and in failing to take such misconduct into account in dividing the marital estate; (2) overvaluing Wife's IRAs at their statement value rather than their lower, present value; and (3) failing to readjust its distribution of the marital estate after it allegedly revalued the marital home in an amended judgment. We affirm.

**Factual and Procedural History** [1]

Husband and wife were married on June 18, 1983. On January 17, 2012, Wife filed a petition for dissolution of marriage. On February 3, 2012, Husband filed his answer to Wife's petition and a counter-petition for dissolution of marriage. The dissolution proceeding was tried to the court in December 2012. Both parties submitted proposed judgments to the trial court.

The trial court entered its judgment of dissolution on January 15, 2013 (the "First Judgment"). Wife filed a motion to amend the First Judgment alleging errors by the trial court in (1) incorrectly attributing $95,000 in value to Wife's asset division based on speculation that Lot 2, the marital home lot,[2] could be split to create an additional lot in the future; (2) incorrectly valuing Wife's retirement accounts at their statement value instead of their present value; and (3) failing to make specific findings on Wife's claim that Husband squandered marital assets.

On January 31, 2013, the trial court entered an amended judgment of dissolution (the "First Amended Judgment") which modified the First Judgment by: (1) adding language to note that there was no indebtedness on the Easterly (Lot 3) and Westerly (Lot 1) Lots of Reed Estates; (2) adding language to note that Lot 2, the marital home lot in Reed Estates, was subject to a mortgage in the amount of $268,000 which Wife would be solely liable to pay as she was awarded that property; (3) awarding Wife her three retire-

---

1. We view the evidence in the light most favorable to the trial court's judgment and defer to the trial court's credibility determinations. *Potts v. Potts*, 303 S.W.3d 177, 184 (Mo.App. W.D.2010).

2. During the marriage, Husband and Wife purchased a 25–acre plot of land known as Reed Estates which was subsequently divided

into the following three lots: Lot 1 which consisted of approximately 6 acres and commonly referred to as the Westerly Lot, Lot 2 which consisted of approximately 15 acres and contained the marital home, and Lot 3 which consisted of approximately 5 acres and commonly referred to as the Easterly Lot.

ment/pension accounts and Husband his retirement/pension account in lieu of purporting to divide those accounts; and (4) correcting an error to refer to Lot 1 as the Westerly lot and Lot 3 as the Easterly lot when the First Judgment mistakenly identified the lots in the reverse.

Wife filed a motion to amend the First Amended Judgment which repeated the same complaints Wife raised with respect to the First Judgment. On February 22, 2013, the trial court entered another amended judgment of dissolution (the "Second Amended Judgment") which modified the First Amended Judgment by: (1) clarifying that the trial court valued Lot 2, the marital home lot, at $375,000, and had not considered the $95,000 in value that could be realized if Lot 2 were subdivided in dividing the marital estate; and (2) adding the separate values of the Westerly Lot and the Easterly Lot to the summary of property awarded to Husband.

Wife filed a motion to amend the Second Amended Judgment again alleging the complaints raised in her earlier motions to amend. On March 6, 2013, the trial court entered an order denying Wife's motion.

Wife appeals.

## Standard of Review

We will affirm the decree of dissolution unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Green v. Green*, 341 S.W.3d 893, 894 (Mo.App. W.D.2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "We view the evidence in the light most favorable to the decree, disregard evidence to the contrary, and defer to the trial court even if the evidence could support a different conclusion." *Sweet v. Sweet*, 154 S.W.3d 499, 503–04 (Mo.App. W.D.2005). We defer to the trial court's credibility determinations and "assume all

factual issues were resolved in favor of the judgment entered." *Id.* at 504. "We review questions of law *de novo.*" *Green*, 341 S.W.3d at 894 (citing *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675, 680–81 (Mo.App. W.D.2009)).

We review the trial court's division of property for an abuse of discretion. *Sabatino v. Sabatino*, 314 S.W.3d 854, 858 (Mo. App. W.D.2010). An abuse of discretion is only found where the award is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, it cannot be said the trial court abused its discretion." *Sweet*, 154 S.W.3d at 504 (internal quotation marks omitted).

"Two other basic rules govern an appellate court's review of an order distributing marital property. The first of these is that section 452.330 does not require an equal division of the marital property" instead emphasizing a just, fair and equitable division under the particular circumstances. *In re Marriage of Strelow*, 581 S.W.2d 426, 429–30 (Mo.App. E.D.1979) (citation omitted). "The second . . . is that the trial court is vested with considerable discretion in dividing the marital property; 'appellate courts will neither scour and nitpick the record for accounting error nor second-guess the trial court's balance of the equities.'" *Id.* at 430 (quoting *In re Marriage of Schulte*, 546 S.W.2d 41, 47 (Mo.App.1977)). "We presume that the division is correct, 'and the party opposing the division bears the burden of overcoming this presumption.'" *Jenkins v. Jenkins*, 406 S.W.3d 919, 925 (Mo.App. W.D. 2013) (quoting *Moen v. Moen*, 140 S.W.3d 611, 613 (Mo.App. W.D.2004)).

## Analysis

### Point I

For her first point, Wife claims that the trial court erred in finding there was no financial misconduct on the part of Husband during the marriage, and thus in failing to take misconduct into account in dividing the marital estate. Wife's point relied on asserts that Husband was guilty of financial misconduct: (1) by amassing over $50,000 in debt without Wife's knowledge; (2) by depleting Wife's $47,000 IRA prematurely after Wife changed the password to the account; and (3) by depleting his $206,000 IRA without Wife's knowledge. Our review of the record indicates that the trial court's finding that Husband did not engage in financial misconduct is supported by substantial evidence, is not against the weight of the evidence, and did not erroneously declare the law.

 Section 452.330.1,[3] which governs the division of property in a dissolution proceeding, provides the trial court is required to consider all relevant factors, including the conduct of the parties during the marriage.

> Under section 452.330.1(4), the trial court is required to consider the parties' conduct during the marriage when dividing the marital property.... [M]arital misconduct is a factor in property division when the offending conduct places extra burdens on the other spouse.... [I]t is only when misconduct of one spouse changes the balance so that the other must assume a greater share of the partnership load that it is appropriate that such misconduct can affect the distribution of property.

*Nelson v. Nelson*, 25 S.W.3d 511, 519 (Mo. App. W.D.2000) (citations and internal quotation marks omitted). Thus, "[e]ven

where misconduct may be found, not all misconduct requires a disproportionate division of marital property." *Dowell v. Dowell*, 203 S.W.3d 271, 282 (Mo.App. W.D. 2006) (internal quotation marks omitted).

> The burden of raising the issue of whether marital property has been squandered or secreted is on the spouse claiming that such conduct has occurred. Once raised, the burden of producing evidence shifts to the alleged wrongdoer spouse who must "account" for the asset by presenting evidence as to its whereabouts or disposition. However, the burden of persuasion remains on the spouse who raised the claims that property has been misappropriated, the value of which had been squandered or secreted.

*Id.* at 279 (citations and internal quotation marks omitted).

> The trial court enjoys broad discretion in making determinations on issues relating to the squandering of assets, because it is in the better position to judge credibility. Therefore, where a court hears evidence showing that a spouse has squandered a marital asset in anticipation of a dissolution action, it may order reimbursement.

*Franklin v. Franklin*, 213 S.W.3d 218, 226 (Mo.App. E.D.2007) (internal citation omitted). However, "[a] spouse who produces evidence that he or she used marital assets to pay for ordinary living expenses during the pendency of the divorce is not considered to have squandered the assets." *Dowell*, 203 S.W.3d at 279.

The trial court found that Husband did not engage in financial misconduct during the marriage, and thus did not consider misconduct in the division of marital assets. Wife argues the trial court's finding is not supported by substantial evidence

3. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

and is erroneous as a matter of law. We disagree.

### The $50,000 in Marital Debt

■ Wife alleges that Husband amassed over $50,000 in marital debt without her knowledge. She claims that between $10,000 and $12,000 was charged to a joint Commerce Bank card sometime before December 2010, and that Husband subsequently charged another $12,000 to this card after she paid $6,000 to reduce the card balance and told Husband not to charge to the card anymore. Wife also claims she learned in June 2011 that Husband took out a $30,000 Capital One loan and incurred $10,000 in debt on a Capital One credit card in her name without her knowledge.

Husband testified that the amounts charged to the joint Commerce Bank card were to pay for marital expenses including central air, homeowners insurance, three car insurances, and the cell phone bill. Husband testified that the $30,000 Capital One loan had been taken out in 2007 to finish the construction of a cul-de sac in Reed Estates, work necessary to create the marital assets of the Easterly and Westerly lots. Husband testified that part of the loan proceeds also went to pay taxes and monthly marital bills. Husband testified that none of the loan proceeds were used for his personal benefit. Husband conceded that he did not have permission to sign Wife's name to the loan but stated that he signed for the loan with the intention of benefitting the family; that he made monthly payments on the loan; that the balance of the loan at the time of trial was down to $7,400; and that Wife's name was removed from the loan in September 2012. Additionally, Husband testified that during the marriage, he routinely signed Wife's name to other documents including tax returns and checks; that she also signed his name to checks; and that they had an understanding that each one could sign the other's name on documents.

### Wife's $47, 000 IRA

■ Wife testified that in the 1990s, her IRA account (Wife's Schwab account) contained between $47,000 and $48,000. Wife testified that she agreed to allow Husband to trade stock in the account, but that when she noticed in 2002 that the account value had dropped to $6,000, she told Husband to stop trading in her account and changed her password. Wife testified that Husband continued trading in her account in 2003 without her permission, and that at the time of trial the account value was only $1,221. Husband testified that he did not trade stocks in Wife's IRA account after Wife asked him to stop doing so and changed her password.

### Husband's $206, 000 IRA

■ Wife testified that Husband took a $50,000 loan against his IRA in 2004, a $9,700 loan in 2006, a $40,000 withdrawal in 2008, a $35,000 withdrawal in 2009, a $15,800 withdrawal in 2010, and a $7,136 withdrawal in 2011. She testified that all of these transactions occurred without her knowledge or consent.

Husband testified that he did borrow money from his IRA account[4] on a regular basis over the years to pay for big ticket items, but that the money "was for family expenses." Husband testified that he never took a loan against his IRA for a personal expense. Husband testified that he could not specifically recall the purpose for the $50,000 withdrawal in 2004 or whether he discussed the withdrawal with Wife.

---

4. The IRA was originally Husband's 401(k) at Ford/TESPHE account before it was rolled over into a self-directed Fidelity IRA in 2007.

Husband stated that he tried to determine the details of the withdrawal from the bank he would have been using at the time, but that the information was unavailable because the account at that bank had been closed for more than seven years. Husband stated that there were a lot of big ticket expenses that came up over the years, and "99 percent of the time it was up to me to fund that big ticket item—that was where I went the majority of the time to pay for big ticket items." Husband testified that the $50,000 withdrawal would have been deposited in the parties' joint checking account to which Wife had access. Husband stated that it was possible that the withdrawal had been used for college expenses, and that he would not have used the money for himself.

Husband testified that the $9,700 withdrawal in 2006 was deposited into the parties' joint checking account and was used in combination with other funds to pay an IRS bill.

Husband testified that loans taken from the IRA triggered a tax liability in 2007 when he switched what had been his Ford 401(k) into a self-directed IRA as the previously borrowed funds were then treated as distributions. He withdrew funds to pay the taxes. Husband testified that this generated a recurring tax bill dilemma such that each year he had to withdraw funds to pay taxes and penalties for the previous year. Ultimately, the account was zeroed out in large part because of the tax dilemma.

Husband testified that when he and Wife moved to New York in 2008 for Wife's job opportunity, he continued to pay the mortgage on the marital home in Kansas City from the parties' joint bank account. Husband testified that he was primarily responsible for continuing to pay the Kansas City expenses and also assisted with the New York expenses. Husband

testified that his $3,000 monthly pension payment was not enough to meet these obligations, so he made a $40,000 withdrawal from his IRA and deposited the money into the parties' joint Wachovia account in New York. Husband used the money for income, real estate, and personal property taxes, and other bills. Husband testified that all withdrawals from the IRA in 2008 and 2009 were used for the benefit of his family and that he did not at any time take money out of this account for his own personal use.

Husband testified that he and Wife moved back to Kansas City from New York in 2009. In 2010, Husband testified that he made another withdrawal from his IRA in the amount of $15,800 which he used for living expenses and taxes. He testified that the $7,136 withdrawal in 2011 was used "to get on top of living expenses." Husband also explained that the IRA lost $90,000 in value in the stock market crash of 2008, 40 percent of which was eventually recovered.

### The Trial Court's Relevant Findings

The trial court made specific findings pertaining to some of Wife's allegations of financial misconduct. Regarding the $30,000 Capital One loan, the trial court found:

31. The Court further finds that [Husband] did take a loan out with Cap One and that he signed [Wife's] name without her knowledge.

32. The Court further finds that the testimony clearly shows that [Husband] used the money to pay for the improvement of the Easterly and Westerly lot and for the cul-de-sac in order to create a fourth lot in the future.

33. The Court further finds that the testimony shows that the remainder of the Cap One loan was used to pay for family expenses.

34. The Court further finds that [Husband] did not use any of the Cap One loan for his personal use.

35. The Court further finds that this loan has been paid down from the original $30,000.00 amount to $7,400.00.

34. The Court further finds that the Cap One loan was used to increase the value of the marital estate.

35. The Court further finds that the parties did sign each other's names to documents during the course of the marriage including, but not limited to, checks and tax returns.

Regarding the alleged depletion of Husband's IRA, the trial court found:

83. The Court further finds that when [Husband] retired from Ford Motor Company, that he incurred a tax bill as a result of a TESPHE loan in the amount of $30,000.

84. The Court further finds that once the parties lost their renter in Kansas City while they were living in New York, that [Husband] was trying to maintain the Kansas City expenses and to pay his share of the New York expenses.

85. The Court further finds that [Husband] was unable to pay for Kansas City and New York expenses, and as a result did withdraw money from his Fidelity IRA account, which was a rollover from Ford Motor Company.

86. The Court further finds that [Husband] withdrew $40,000 in 2008, which was reported on the parties' joint income tax return for 2008.

87. The Court further finds that [Husband's] Fidelity IRA lost $90,000 in value due to the 2008 stock market crash.

88. The Court further finds that [Husband] withdrew $30,000 in 2009 from his Fidelity IRA, which was reported on their 2009 joint income tax returns; and that [Husband] withdrew $15,800 from his Fidelity IRA in 2010, which was again reported on their 2010 joint income tax returns; and that [Husband] withdrew approximately $7,100 from his Fidelity IRA in 2011.

89. The Court further finds that [Husband] testified that all of the money withdrawn from his Fidelity IRA was used for family expenses, including taxes, real estate taxes, personal property taxes, and other family expenses.

90. The Court further finds that [Wife] had the opportunity to review the tax returns prior to filing, or could have reviewed tax returns at any time subsequent to filing, and could have clearly seen that the IRA withdrawals were reported on their joint income tax returns.

91. The Court further finds that a TESPHE loan was taken out in 2006 in the amount of $9,700, which [Wife] stated that she did not know what that TESPHE loan was for.

92. The Court further finds that [Husband] produced documents from Bank of the West that clearly showed that $9,700 TESPHE loan was deposited in their joint account at the Bank of the West, which at that time was know[n] as the Commercial Federal Credit Union. [Husband] testified that the funds were used for the family expenses.

93. The Court further finds that [Husband] testified that [Wife] had access to the joint account and all information regarding that joint account.

94. The Court further finds that [Husband's] investment objective in his Fidelity IRA was to be conservative.

95. The Court further finds that [Husband] testified that at no time did he spend monies that he received via the Cap One loan, or the TESPHE loan, or the withdrawal from hid Fidelity IRA for his own personal use. [Husband]

testified that all monies were used for the family expenses.

96. The Court further finds that both parties testified that [Husband] did not go to the boats.

The trial court then made the following general finding in response to Wife's allegation of financial misconduct:

92. ***The Court further finds that there is no financial misconduct on the part of [Husband].***

(Emphasis added.) The trial court's findings, both specific and general, are supported by the evidence herein summarized.

Similar trial court determinations in other cases have been consistently upheld. In *Mistler v. Mistler*, 816 S.W.2d 241 (Mo. App. S.D.1991), the Southern District upheld the trial court's finding that husband did not engage in financial misconduct. Wife asserted that the trial court's property division failed to compensate her for payments she made to preserve marital assets when there was evidence that husband made no similar payments and had, in fact, depleted marital assets with expenditures totaling $218,803. *Id.* at 253. Husband generally testified that all of the expenditures were for marital living expenses. *Id.* On appeal, the Southern District found that "the record supports a conclusion that, although [husband] could not provide a specific accounting of certain expenditures, the husband did not 'squander' marital assets." *Id.*

In *Sinclair v. Sinclair*, 837 S.W.2d 355, 357 (Mo.App. W.D.1992), wife testified that she spent $17,000.00 withdrawn from a joint account on everyday items and household expenses. On appeal, husband argued that the trial court erred and abused its discretion in dividing the marital property by failing to conclude that Wife squandered the money. *Id.* at 359. Husband argued that without receipts or other proof to support the claimed use of the

funds, the court should have concluded that the funds were squandered. *Id.* In affirming the trial court, this court noted that great deference is given to the trial court on matters of witness credibility and found that the trial court could have reasonably believed that wife did not squander the funds but spent them as she had testified. *Id.*

In *Romkema v. Romkema*, 918 S.W.2d 294, 298 (Mo.App. E.D.1996), wife argued that the trial court should have taken husband's dissipation of a joint bank account into consideration in dividing the marital estate. In rejecting wife's claim, the Eastern District held that although no accounting of specific expenditures was provided, the trial court was free to exercise its discretion to accept husband's testimony explaining the use of the funds. *Id.; see also Fitzwater v. Fitzwater*, 151 S.W.3d 135, 137 (Mo.App. W.D.2004) (holding that there was insufficient evidence to support a finding that husband secreted or squandered sale proceeds of marital farm where husband testified that he used most of the proceeds to pay off various creditors of marital debt and wife failed to satisfy her burden of proof to show that husband squandered the proceeds or that the funds were improperly expended).

As in *Mistler, Sinclair, Romkema,* and *Fitzwater*, Husband testified that all of the marital funds about which Wife complains were used for marital expenses and that none were used for his personal expenses. It was within the trial court's discretion to accept Husband's testimony as credible. Wife failed to present any evidence that Husband misused any of the complained of marital funds. Instead, Wife relied solely on her bare assertion that Husband expended marital funds, a point Husband does not dispute. Consistent with his burden of production, Husband responded to Wife's allegations with evidence sufficient

to support a finding that Husband did not engage in financial misconduct. *Dowell*, 203 S.W.3d at 279. It remained Wife's burden, however, to persuade the trial court of her allegations of misconduct. *Id.* We find no abuse of discretion in the trial court's finding that Wife failed to satisfy this burden.

Wife relies on *Francka v. Francka*, 951 S.W.2d 685 (Mo.App. S.D.1997), and *In re Marriage of Strelow*, 581 S.W.2d 426 (Mo. App. E.D.1979), and claims that *Strelow*, in particular, is both factually and procedurally on point with this case. Wife argues that these cases required the trial court to find financial misconduct as a matter of law. We disagree that other cases hold that certain facts, if present, require a finding of financial misconduct as a matter of law. Further, we conclude that both cases are factually distinguishable from the present case.

In *Strelow*, both parties appealed the trial court's cash award to husband to equalize the property division. 581 S.W.2d at 428. The Eastern District, after considering the conduct of the parties during the marriage, concluded that the evidence of husband's financial misconduct weighed strongly in favor of wife and noted that husband's financial activities must be categorized as a "profligate dissipation of the marital assets." *Id.* at 430–31. These activities included purchasing or leasing thirteen different vehicles during the three year marriage, one which was repossessed at a loss of $3,000, and purchasing three boats, one of which was repossessed at a loss of $2,000. *Id.* at 431. The court also noted that there was evidence that the husband endorsed or signed wife's name to checks and documents without her knowledge or approval and misappropriated funds to his own account which ought to have been joint property. *Id.* Unlike the present case, husband offered no evidence

that his expenditures had been for proper marital purposes.

Similarly, in *Francka*, the husband appealed the trial court's division of property which included an order that he was to pay wife $17,781.50 to equitably compensate her for his "dissipation of marital insurance proceeds." 951 S.W.2d at 699. Husband argued that the trial court placed undue emphasis on his financial misconduct rendering the division of property unjust. *Id.* The Southern District held that husband was in no position to complain that he repay $17,781.50 to wife for funds he intentionally dissipated in anticipation of the dissolution action that he filed. *Id.* at 700. Although husband argued that he used the majority of the insurance proceeds for household expenses, the appellate court noted that the trial court "was not obligated to accept that explanation as to how the funds were used. The trial court is free to disbelieve witness' testimony or vague accounting that they used expended money for living expenses." *Id.* (internal quotation marks omitted). At best, *Francka* underscores the deference appellate courts afford a trial court's credibility determinations.

The trial court did not abuse its discretion in concluding that Husband did not engage in financial misconduct.

Point One is denied.

### Point II

In her second point relied on, Wife argues that the trial court erred in its valuation of her IRAs. The trial court concluded that Wife had two IRAs with a combined statement value of $429,769 at the time of trial. Wife contends that in assigning the statement value to her IRAs without taking into consideration the tax implications of immediate liquidation of the IRAs, the trial court overvalued her IRAs, resulting in an unfair and inaccurate divi-

sion of the marital estate. Wife requests that we reverse the trial court's judgment and remand with instructions to revalue the IRAs before re-dividing the marital estate.

 The trial court has broad discretion in valuing an IRA for the purpose of distributing property. *Calhoun v. Calhoun*, 156 S.W.3d 410, 417 (Mo.App. S.D. 2005). In valuing any marital asset for division, including IRAs, tax consequences are a factor for the trial court to consider. *Homfeld v. Homfeld*, 954 S.W.2d 617, 621 (Mo.App. W.D.1997). "However, the trial court is not permitted 'to make deductions to the marital estate for estimated tax liabilities absent sufficient evidence to support its findings.'" *Id.* (quoting *Baldwin v. Baldwin*, 905 S.W.2d 521, 524 (Mo.App. E.D.1995)). Adverse tax implications must be "established with particularity" at trial. *Calhoun*, 156 S.W.3d at 417. "If a party fails to meet this burden, then he or she is precluded from raising the issue as an error on appeal." *Id.*

Wife asserts that she presented sufficient evidence to establish the adverse tax consequences she would suffer if she immediately liquidated her IRAs. Wife claims that the testimony of Scott McRuer ("McRuer"), a certified public accountant, established that if she liquidated her IRAs on the day of trial, she would suffer a 10 percent penalty for early withdrawal as well as income taxes on the assets. Wife also claims that McRuer testified that she would not be able to liquidate her IRAs until she reached age sixty-five. Wife misrepresents McRuer's testimony.

McRuer testified as to the adverse tax consequences Husband and Wife suffered as a result of Husband's liquidation of his IRA in 2007, 2008, 2009, and 2010. McRuer testified that Husband and Wife paid a 10 percent penalty for each early withdrawal as well as extra tax liability in those years because Husband was not yet 59 1/2 years old. McRuer never testified as to the adverse tax consequences that Wife would suffer if she liquidated her IRAs at the time of trial.

Further, McRuer never testified that Wife would not be able to liquidate her IRAs until she reached age sixty-five. Instead, McRuer testified about the present value of Husband's pension plan and Wife's pension plan. With respect to Wife's pension plan, McRuer testified that she would not be able to receive payments until she reached age sixty-five. McRuer's testimony about Wife's pension plan is inapplicable to Wife's IRAs. By suggesting otherwise, Wife ignores 26 U.S.C. section 72(t)(2)(A)(i), which provides that all funds withdrawn from an IRA prior to the employee attaining age 59 1/2 are subject to a 10 percent penalty.

In *Calhoun*, the appellant presented the same argument as Wife: that the trial court erred in failing to consider the adverse tax consequences of liquidating the IRAs awarded to her. 156 S.W.3d at 416–17. At trial, a financial expert admitted that the appellant would have to pay ordinary income taxes on the annual withdrawals from the IRAs. *Id.* at 417. The court concluded that the financial expert's admission was not sufficient evidence to support her claim on appeal. *Id.* at 418. It explained:

> There was no testimony relating to the applicable tax rate, whether the amount would change from year to year, how the court should evaluate the tax consequences, whether the court should award a credit for the tax consequences in the future and reduce that to present value, or a host of other considerations. Simply stated, [the appellant] presented no evidence and no claim to the court that it should award her a credit for the

tax consequences stemming from the IRAs.

*Id.* at 417–18.

Here, while Wife presented evidence that would support the conclusion that she would be subject to a 10 percent penalty if she immediately liquidated her IRAs, Wife presented no evidence regarding the tax rate that would be applied to the assets liquidated. There was also no evidence about how the trial court should value the IRAs other than their statement value. McRuer's testimony, contrary to Wife's suggestion, did not serve as sufficient evidence to establish the full extent of the adverse tax implications that Wife would suffer from immediately liquidating her IRAs. As a result, Wife is precluded from raising the issue as an error on appeal. *Calhoun,* 156 S.W.3d at 417.

 Even if Wife had presented sufficient evidence to establish the full extent of the adverse tax implications that she would suffer if she immediately liquidated the IRAs, there was no evidence presented at trial from which the court could conclude that Wife would have to liquidate the IRAs prior to reaching age 59 1/2 so that she would pay both the 10 percent penalty and income taxes. In *Kauffman v. Kauffman,* the cross-appellant argued that the trial court erred in taking into consideration the tax consequences when valuing certain assets because there was no evidence presented that those assets would be sold. 101 S.W.3d 35, 50 (Mo.App. W.D. 2003). The court acknowledged that " 'deductions to the marital estate for estimated tax liabilities' " must be supported by evidence. *Id.* (quoting *Homfeld,* 954 S.W.2d at 621). That evidence would include not only the extent of adverse tax implications, as we discuss above, but also that the circumstances are such that the need to incur tax implications are reasonably certain. In *Kauffman,* the court con-

cluded that although there was no direct testimony that the assets would have to be sold to support the cross-respondent's living expenses, the record supported the inference. *Id.* In particular, the record established that the cross-respondent had a low income-earning potential and that the cross-appellant was awarded non-cash and non-income producing assets. *Id.*

Here, there was no evidence presented to support an inference that Wife would have to liquidate her IRAs to support her living expenses. Wife concedes as much at oral argument. Rather, the record indicated that, in her employment with Zurich, Wife earned approximately $147,000 per year. There was no evidence presented that would indicate Wife's salary as well as the other marital assets she was awarded were insufficient to support her living expenses. Thus, even if Wife had presented sufficient evidence to establish the full extent of the adverse tax implications she would suffer from liquidating her IRAs, there was insufficient evidence in the record to support deductions to the marital estate for estimated tax liabilities.

We find no abuse of discretion in the trial court's failure to consider the adverse tax implications of immediate liquidation of the IRAs. Wife's second point relied on is denied.

### Point III

For her third and final point, Wife claims that the trial court erred in not readjusting its distribution of the marital estate after it entered the Second Amended Judgment which (according to Wife) revalued Lot 2, the marital home lot. Wife claims that in the First Judgment and First Amended Judgment, the trial court found Lot 2 to have a value of $470,000. Wife claims that in the Second Amended Judgment, the trial court found Lot 2 to have a value of $375,000 and then

failed to readjust the division of the marital estate property to reflect the revaluation. We disagree with Wife's characterization of the trial court's judgments.

In the First Judgment, the trial court found in relevant part:

25. The Court further finds that the Easterly and the Westerly lots have a value of approximately $80,000.00 each.

26. The Court further finds that the Lot 2, on 15 acres, has a value of approximately $375,000.00.

27. The Court further finds that both parties have testified that a house on 6+ acres is not worth much more than a house on 15 acres.

28. The Court further finds that if Lot 2 is subdivided that the house on 6+ acres have [sic] a value of $370,000.00.

29. The Court further finds that if a new lot is created on 8.67 acres it would have a value of $95,000.00.

30. The Court further finds that the current Lot 2 has a much greater value than $375,000 because it can be divided into another 8.67 acre lot.

. . . .

38. The Court further finds that [Wife] believed that it was her idea to subdivide the property into three lots with the potential for a fourth lot. The Court believes that an equitable division of the real estate is to award [Wife] the house on the 15 acres [Lot 2] with the potential of a fourth lot. [Husband] shall execute a quit-claim deed. [Wife] shall pay the 2012 real estate taxes.

39. The Court further finds that [Husband] should be awarded the Easterly and Westerly lots. [Wife] shall execute a quit-claim deed. [Husband] shall pay the 2012 real estate taxes.

As previously noted, Wife filed a motion to amend the First Judgment arguing, in part, that the trial court incorrectly valued

Lot 2 at $470,000 by attributing $95,000 in value to the marital assets awarded Wife based on the future possibility of subdivision of Lot 2. The trial court did not modify any of its findings in the First Amended Judgment in response to this concern, and added only findings with respect to the indebtedness owed (if any) on the lots in Reed Estates and an ascription of responsibility for such indebtedness to the party awarded a lot. Specifically, the trial court modified paragraphs 25 and 26 from the First Judgment as follows:

25. The Court further finds that the Easterly and Westerly lots have a value of approximately $80,000.00 each *and no indebtedness.*

26. The Court further finds that the Lot 2, on 15 acres, has a value of approximately $375,000, *and a mortgage in the amount of $268,000.00 owed to Bank of the West.*

(Emphasis added.)

Subsequently, Wife filed another motion to amend the First Amended Judgment again arguing, in part, that the trial court incorrectly valued Lot 2 at $470,000 by attributing $95,000 in value to the marital assets awarded Wife based on the future possibility of subdivision of Lot 2. In response, the trial court entered the Second Amended Judgment, which modified its preceding judgments as follows:

26. The Court further finds that the Lot 2, on 15 acres, has a value of approximately $375,000.00, and a mortgage in the amount of $268,000.00 owed to Bank of the West. *The Court used the value of $375,000.00 in determining the value of the marital estate and in dividing the marital property between the parties.*

. . . .

28. The Court further finds that if Lot 2 is subdivided that the house on 6+ acres have [sic] a value of $370,000.00.

***The Court did not use this value in determining the value of the marital estate and in dividing the marital property of the parties.***

29. The Court further finds that if a new lot is created on 8.67 acres it would have a value of $95,000.00. ***The Court did not use this value in determining the value of the marital estate and in dividing the marital property of the parties.***

30. The Court further finds that the current Lot 2 ***could*** have a greater value than $375,000.00 because it can be divided into another 8.67 acre lot. ***This was not considered by the Court in determining the marital estate and in dividing the marital property between the parties.***

(Emphasis added).

Wife interprets the evolution of the trial court's judgments as an acknowledgment by the trial court that it valued Lot 2 in both the First Judgment and the First Amended Judgment at $470,000. The plain language of the earlier judgments indicates to the contrary. In both, paragraph 26 clearly expressed the finding that Lot 2 has a value of $375,000. Though both judgments do address the prospect of future value should Lot 2 be subdivided, neither the First Judgment nor the First Amended Judgment contain any express finding or conclusion suggesting the trial court factored the future potential value of lot 2 into the division of the marital estate. Any confusion on this point is expressly erased by the plain language of the Second Amended Judgment in which the trial court made it abundantly clear that it had not taken the potential value of Lot 2 if subdivided into consideration in dividing the marital estate.

Wife relies on *Seggelke v. Seggelke*, 319 S.W.3d 461 (Mo.App. E.D.2010), a case which is readily distinguishable. In *Seggelke*, the trial court's initial judgment awarded wife a 401(k) valued at $34,176.00. *Id.* at 465. Wife filed a motion to amend noting that the evidence established that the 401(k) no longer existed and had been rolled into a different retirement account. *Id.* In its amended judgment, the trial court admitted its error and removed the 401(k) from the list of marital property awarded wife. *Id.* The trial court did not, however, adjust the distribution of property to account for removed, non-existent, asset. *Id.* The Eastern District held:

> The trial court found its initial division, which awarded Wife just over 51% of the marital property valued by the parties, to be fair; therefore, a reduction of over $34,000, which resulted in Wife receiving less than 49% of the marital property valued by the parties, due solely to the trial court's own error requires reconsideration of the division of marital property.

*Id.*

Here, the trial court never awarded Wife a non-existent asset. Instead, the trial court expressly stated in its Second Amended Judgment that it had not considered the additional potential value Lot 2 in its division of the marital estate. All versions of the trial court's judgment of dissolution expressly valued Lot 2 at $375,000.00. Unlike the circumstances in *Seggelke*, there is no basis for us to conclude that the trial court mistakenly ascribed non-existent property to Wife, the correction of which required an adjustment in the division of assets.

Point Three is denied.

### Conclusion

We affirm the trial court's judgment.

All concur.